No. 14-10794-FF

IN THE

# United States Court of Appeals

FOR THE ELEVENTH CIRCUIT

SHERVON HOGSETT, individually, and as Administratrix of the Estate of
PATRICIA JOYNER, deceased, and GARY JOYNER, individually,

*Plaintiffs-Appellees.*

v.

PARKWOOD NURSING & REHABILITATION CENTER, INC., PARKWOOD LIVING
CENTER, LLC, HMR ADVANTAGE HEALTH SYSTEMS, INC., SCEPTER HEALTH &
REHAB OF SNELLVILLE, LLC, COVENANT DOVE, INC., COVENANT DOVE, LLC,
ARK HOLDING COMPANY, INC., and ARK HOLDINGS, LLC,

*Defendant-Appellants,*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

## APPENDIX

Jason E. Bring, Georgia Bar No.: 082498
jason.bring@agg.com
W. Jerad Rissler, Georgia Bar No.: 142024
jerad.rissler@agg.com
ARNALL GOLDEN GREGORY LLP
171 17th Street, Suite 2100
Atlanta, Georgia 30363-1031
Tel: (404) 873-8500

Counsel for Appellants

# INDEX

District Court Docket Sheet ................................................................Docket Sheet

Notice of Removal..................................................................................... 1

Complaint ................................................................................................ 1-1

Defendant's Motion to Dismiss or, Alternatively, to Stay Proceedings
and Compel Arbitration ........................................................................... 4

Admission Agreement ............................................................................. 4-3

Arbitration Agreement............................................................................. 4-4

Declaration of Michael H. McBride........................................................4-7

Declaration of Shervon Hogsett ............................................................ 8-1

     Exhibit A:  Arbitration Agreement ........................................... 8-2

     Exhibit B:  Admission Agreement ........................................... 8-3

Declaration of Zachary Wood (including Admission Agreement and
Arbitration Agreement) ........................................................................ 12-1

Order Granting Plaintiffs' Motion to Amend and Clarify the
Court's March 6, 2013 Order ................................................................ 23

Amended Order and Opinion ................................................................ 24

4months,APPEAL,STAY

# U.S. District Court
# Northern District of Georgia (Atlanta)
# CIVIL DOCKET FOR CASE #: 1:12-cv-01399-JEC

| | |
|---|---|
| Hogsett et al v. Parkwood Nursing & Rehabilitation Center, Inc. et al | Date Filed: 04/23/2012 |
| Assigned to: Judge Julie E. Carnes | Jury Demand: Plaintiff |
| Case in other court: State Court of Fulton County, 12EV014630C | Nature of Suit: 362 Personal Inj. Med. Malpractice |
| USCA - 11th Circuit., 14-10794-FF | Jurisdiction: Diversity |
| Cause: 28:1441 Petition for Removal- Non-Motor Vehicle | |

**Plaintiff**

| | | |
|---|---|---|
| **Shervon Hogsett** <br> *Individually, and as Administratrix of the Estate of Patricia Joyner, deceased* | represented by | **Steven Salcedo** <br> Law Office of Steven Salcedo, LLC <br> P.O. Box 1950 <br> Suite 225 <br> 150 E. Ponce De Leon Avenue <br> Decatur, GA 30031-1950 <br> 404-907-0802 <br> Fax: 404-551-5307 <br> Email: steven@salcedolawfirm.com <br> *ATTORNEY TO BE NOTICED* |
| | | **Wayne D. Toth** <br> The Toth Law Firm, LLC <br> 2890 Piedmont Road <br> Atlanta, GA 30305 <br> 404-250-1564 <br> Fax: 404-584-7002 <br> Email: waynetoth@waynetothlaw.com <br> *ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Gary Joyner** <br> *Individually* | represented by | **Steven Salcedo** <br> (See above for address) <br> *ATTORNEY TO BE NOTICED* |
| | | **Wayne D. Toth** <br> (See above for address) <br> *ATTORNEY TO BE NOTICED* |

V.

**Defendant**

**Parkwood Nursing & Rehabilitation Center, Inc.**

represented by **Jason E. Bring**
Arnall Golden Gregory LLP
171 17th Street
Suite 2100
Atlanta, GA 30336
404-873-8162
Fax: 404-873-8163
Email: jason.bring@agg.com
*ATTORNEY TO BE NOTICED*

**W. Jerad Rissler**
Arnall Golden & Gregory - Atlanta
Suite 2100
171 17th Street, NW
Atlanta, GA 30363-1031
404-873-8780
Fax: 404-873-8781
Email: jerad.rissler@agg.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Parkwood Living Center, LLC**

represented by **Jason E. Bring**
(See above for address)
*ATTORNEY TO BE NOTICED*

**W. Jerad Rissler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**HMR Advantage Health Systems, Inc.**

represented by **Jason E. Bring**
(See above for address)
*ATTORNEY TO BE NOTICED*

**W. Jerad Rissler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Scepter Health & Rehab of Snellville, LLC**

represented by **Jason E. Bring**
(See above for address)
*ATTORNEY TO BE NOTICED*

**W. Jerad Rissler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Covenant Dove, Inc.**

represented by **Jason E. Bring**
(See above for address)
*ATTORNEY TO BE NOTICED*

**W. Jerad Rissler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Covenant Dove, LLC**

represented by **Jason E. Bring**
(See above for address)
*ATTORNEY TO BE NOTICED*

**W. Jerad Rissler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Covenant Dove Holding Company,
LLC**
*TERMINATED: 03/06/2013*

represented by **Jason E. Bring**
(See above for address)
*ATTORNEY TO BE NOTICED*

**W. Jerad Rissler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ark Holding Company, Inc.**

represented by **Jason E. Bring**
(See above for address)
*ATTORNEY TO BE NOTICED*

**W. Jerad Rissler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ark Holdings, LLC**

represented by **Jason E. Bring**
(See above for address)
*ATTORNEY TO BE NOTICED*

**W. Jerad Rissler**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/23/2012 | 1 | NOTICE OF REMOVAL with COMPLAINT filed by Scepter Health & Rehab of Snellville, LLC, Parkwood Living Center, LLC, HMR Advantage Health |

| | | |
|---|---|---|
| | | Systems, Inc., Covenant Dove, LLC, Ark Holding Company, Inc., Covenant Dove Holding Company, LLC and Parkwood Nursing & Rehabilitation Center, Inc.. Consent form to proceed before U.S. Magistrate and pretrial instructions provided. (Filing fee $ 350.00 receipt number 113E-3894212) (Attachments: # 1 Exhibit A, # 2 Civil Cover Sheet)(eop) Please visit our website at http://www.gand.uscourts.gov to obtain Pretrial Instructions. (Entered: 04/24/2012) |
| 04/30/2012 | 2 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM with Brief In Support by Ark Holding Company, Inc., Covenant Dove Holding Company, LLC, Covenant Dove, LLC, HMR Advantage Health Systems, Inc., Parkwood Living Center, LLC, Parkwood Nursing & Rehabilitation Center, Inc., Scepter Health & Rehab of Snellville, LLC. (Attachments: # 1 Brief Memorandum of Law in Support)(Bring, Jason) (Entered: 04/30/2012) |
| 04/30/2012 | 3 | MOTION to Dismiss *for Lack of Personal Jurisdiction* with Brief In Support by Ark Holding Company, Inc., Covenant Dove Holding Company, LLC, Covenant Dove, LLC, HMR Advantage Health Systems, Inc., Parkwood Living Center, LLC, Parkwood Nursing & Rehabilitation Center, Inc., Scepter Health & Rehab of Snellville, LLC. (Attachments: # 1 Brief Memorandum of Law in Support, # 2 Exhibit Exhibit A to Memorandum of Law)(Bring, Jason) (Entered: 04/30/2012) |
| 04/30/2012 | 4 | MOTION to Dismiss or, Alternatively, MOTION to Stay Proceedings and MOTION to Compel Arbitration with Brief In Support by Ark Holding Company, Inc., Covenant Dove Holding Company, LLC, Covenant Dove, LLC, HMR Advantage Health Systems, Inc., Parkwood Living Center, LLC, Parkwood Nursing & Rehabilitation Center, Inc., Scepter Health & Rehab of Snellville, LLC. (Attachments: # 1 Exhibit A to Motion, # 2 Brief, # 3 Exhibit A to Memorandum, # 4 Exhibit B to Memorandum, # 5 Exhibit C to Memorandum, # 6 Errata D to Memorandum, # 7 Exhibit E to Memorandum) (Bring, Jason) . Added MOTION to Stay, MOTION to Compel on 5/1/2012 (rej). (Entered: 04/30/2012) |
| 05/01/2012 | 5 | NOTICE of Voluntary Dismissal *of Plaintiffs' Estate Action Only* filed by Shervon Hogsett, Gary Joyner (Toth, Wayne) (Entered: 05/01/2012) |
| 05/01/2012 | | Clerk's Entry of Dismissal APPROVING 5 Notice of Voluntary Dismissal of Estate Action pursuant to Fed.R.Civ.P.41(a)(1)(i). (rej) (Entered: 05/02/2012) |
| 05/07/2012 | 6 | NOTICE Of Filing Supplement to Complaint pursuant to O.C.G.A. 9-11-9.1 by Shervon Hogsett, Gary Joyner (Attachments: # 1 Affidavit, # 2 Exhibit)(Toth, Wayne) (Entered: 05/07/2012) |
| 05/07/2012 | 7 | NOTICE of Appearance by Steven Salcedo on behalf of Shervon Hogsett, Gary Joyner (Salcedo, Steven) (Entered: 05/07/2012) |
| 05/13/2012 | 8 | RESPONSE in Opposition re 4 MOTION to Dismiss *or, Alternatively, to Stay Proceedings and Compel Arbitration* MOTION to Stay MOTION to Compel filed by Shervon Hogsett, Gary Joyner. (Attachments: # 1 Affidavit Declaration of Shervon Hogsett, # 2 Exhibit Agreement to Arbitrate Ex A, # 3 Exhibit Admission Agreement Ex B)(Toth, Wayne) (Entered: 05/13/2012) |
| | | |

| 05/14/2012 | 9 | Consent MOTION for Extension of Time to File Response re: 3 MOTION to Dismiss *for Lack of Personal Jurisdiction* by Covenant Dove Holding Company, LLC, Shervon Hogsett, Gary Joyner. (Attachments: # 1 Text of Proposed Order)(Salcedo, Steven) (Entered: 05/14/2012) |
|---|---|---|
| 05/14/2012 | 10 | RESPONSE in Opposition re 2 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Shervon Hogsett, Gary Joyner. (Salcedo, Steven) (Entered: 05/14/2012) |
| 05/15/2012 |  | MINUTE ORDER (by docket entry only) granting 9 Consent Motion for Extension of Time through July 2, 2012 for plaintiffs to respond re 3 MOTION to Dismiss *for Lack of Personal Jurisdiction*. Ordered by Judge Julie E. Carnes on 5/15/12. (ekb) (Entered: 05/15/2012) |
| 05/25/2012 | 11 | Withdrawal of Motion 2 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by HMR Advantage Health Systems, Inc., Scepter Health & Rehab of Snellville, LLC, Covenant Dove Holding Company, LLC, Ark Holding Company, Inc., Covenant Dove, LLC, Parkwood Nursing & Rehabilitation Center, Inc., Parkwood Living Center, LLC filed by Ark Holding Company, Inc., Ark Holdings, LLC, Covenant Dove Holding Company, LLC, Covenant Dove, Inc., Covenant Dove, LLC, HMR Advantage Health Systems, Inc., Parkwood Living Center, LLC, Parkwood Nursing & Rehabilitation Center, Inc., Scepter Health & Rehab of Snellville, LLC. (Bring, Jason) (Entered: 05/25/2012) |
| 05/25/2012 | 12 | REPLY BRIEF re 4 MOTION to Dismiss *or, Alternatively, to Stay Proceedings and Compel Arbitration* MOTION to Stay MOTION to Compel *Arbitration* filed by Ark Holding Company, Inc., Ark Holdings, LLC, Covenant Dove Holding Company, LLC, Covenant Dove, Inc., Covenant Dove, LLC, HMR Advantage Health Systems, Inc., Parkwood Living Center, LLC, Parkwood Nursing & Rehabilitation Center, Inc., Scepter Health & Rehab of Snellville, LLC. (Attachments: # 1 Exhibit A-Declaration of Zachary Wood, # 2 Exhibit B)(Bring, Jason) (Entered: 05/25/2012) |
| 05/31/2012 |  | Submission of 4 MOTION to Dismiss or, Alternatively, MOTION to Stay Proceedings and MOTION to Compel Arbitration, submitted to District Judge Julie E. Carnes. (ddm) (Entered: 05/31/2012) |
| 07/02/2012 | 13 | Consent MOTION for Extension of Time to File Response re: 3 MOTION to Dismiss *for Lack of Personal Jurisdiction* by Covenant Dove Holding Company, LLC, Shervon Hogsett, Gary Joyner. (Attachments: # 1 Text of Proposed Order)(Salcedo, Steven) (Entered: 07/02/2012) |
| 07/03/2012 |  | MINUTE ORDER (by docket entry only) granting 13 Consent Motion for Extension of Time through September 4, 2012 for plaintiffs to respond re 3 MOTION to Dismiss. Ordered by Judge Julie E. Carnes on 7/3/12. (ekb) (Entered: 07/03/2012) |
| 09/06/2012 |  | Submission of 3 MOTION to Dismiss *for Lack of Personal Jurisdiction*, submitted to District Judge Julie E. Carnes. (FILE IN CHAMBERS) (ddm) (Entered: 09/06/2012) |
| 01/07/2013 | 14 |  |

| | | NOTICE of Change of Address for Wayne D. Toth, counsel for Shervon Hogsett, Gary Joyner (Toth, Wayne) (Entered: 01/07/2013) |
|---|---|---|
| 03/06/2013 | 15 | ORDER AND OPINION denying defendants [4-1 and 4-3] Motion to Dismiss and Compel Arbitration as to plaintiff Gary Joyner; denying without prejudice defendants [4-1 and 4-3] Motion to Dismiss and Compel Arbitration as to plaintiff Shervon Hogsett; and granting defendants [4-2] Motion to Stay the litigation. Defendant Covenant Dove Holding Company, LLCs 3 Motion to Dismiss for Lack of Personal Jurisdiction is granted as unopposed. Plaintiffs shall file an Amended Complaint by April 8, 2013. Signed by Judge Julie E. Carnes on 3/6/13. (ddm) (Entered: 03/06/2013) |
| 03/13/2013 | 16 | MOTION to Amend 15 Order on Motion to Dismiss,, Order on Motion to Stay, Order on Motion to Compel,,,,,,,, , MOTION for Clarification re: 15 Order on Motion to Dismiss,, Order on Motion to Stay, Order on Motion to Compel,,,,,,,, by Shervon Hogsett, Gary Joyner. (Toth, Wayne) (Entered: 03/13/2013) |
| 03/14/2013 | | MINUTE ORDER (by docket entry only) staying the plaintiffs' deadline for filing an amended complaint pending resolution of their new 16 MOTION to Amend and Clarify the Court's 15 Order and Opinion. Ordered by Judge Julie E. Carnes on 3/14/13. (ekb) (Entered: 03/14/2013) |
| 03/26/2013 | 17 | Consent MOTION to Stay *Proceedings and Set Appeal Deadline* by Ark Holding Company, Inc., Ark Holdings, LLC, Covenant Dove Holding Company, LLC, Covenant Dove, Inc., Covenant Dove, LLC, HMR Advantage Health Systems, Inc., Parkwood Living Center, LLC, Parkwood Nursing & Rehabilitation Center, Inc., Scepter Health & Rehab of Snellville, LLC. (Attachments: # 1 Text of Proposed Order Consent Order to Stay Proceedings and Set Appeal Deadline)(Rissler, W.) (Entered: 03/26/2013) |
| 03/26/2013 | 18 | ORDER granting 17 Motion to Stay for twenty-one (21) calendar days from the date of this Order to allow the parties to pursue and complete settlement discussions. If a settlement is reached, the parties shall promptly notify the Court. If a settlement is not reached, Defendants shall submit a response to Plaintiffs Motion to Amend and Clarify [Doc. 16] by the forty-fifth calendar day from the date of this Order. Signed by Judge Julie E. Carnes on 3/26/13. (hfm) (Entered: 03/26/2013) |
| 05/10/2013 | 19 | Consent MOTION to Stay *Proceedings and Set Appeal Deadline* by Ark Holding Company, Inc., Ark Holdings, LLC, Covenant Dove Holding Company, LLC, Covenant Dove, Inc., Covenant Dove, LLC, HMR Advantage Health Systems, Inc., Shervon Hogsett, Gary Joyner, Parkwood Living Center, LLC, Parkwood Nursing & Rehabilitation Center, Inc., Scepter Health & Rehab of Snellville, LLC. (Attachments: # 1 Text of Proposed Order)(Bring, Jason) (Entered: 05/10/2013) |
| 05/22/2013 | 20 | ORDER granting 19 Consent Motion to Stay Proceedings and Set Appeal Deadline. Signed by Judge Julie E. Carnes on 5/22/13. (ddm) (Entered: 05/22/2013) |
| 07/10/2013 | 21 | RESPONSE in Opposition re 16 MOTION to Amend 15 Order on Motion to Dismiss,, Order on Motion to Stay, Order on Motion to Compel,,,,,,,, MOTION |

| | | |
|---|---|---|
| | | for Clarification re: 15 Order on Motion to Dismiss,, Order on Motion to Stay, Order on Motion to Compel,,,,,,,,, filed by Ark Holding Company, Inc., Ark Holdings, LLC, Covenant Dove Holding Company, LLC, Covenant Dove, Inc., Covenant Dove, LLC, HMR Advantage Health Systems, Inc., Parkwood Living Center, LLC, Parkwood Nursing & Rehabilitation Center, Inc., Scepter Health & Rehab of Snellville, LLC. (Rissler, W.) (Entered: 07/10/2013) |
| 08/14/2013 | | Submission of 16 MOTION to Amend 15 Order, MOTION for Clarification re: 15 Order, submitted to District Judge Julie E. Carnes. (ddm) (Entered: 08/14/2013) |
| 12/20/2013 | 22 | Notice for Leave of Absence for the following date(s): April 14 - 18, April 21 - 25, June 23 - 27, June 30 - July 3, 2014, by Wayne D. Toth. (Toth, Wayne) (Entered: 12/20/2013) |
| 02/18/2014 | 23 | ORDER granting plaintiffs 16 Motion to Amend and Clarify the Courts March 6, 2013 Order 15 to reflect that plaintiff Gary Joyner is decedents son rather than her spouse. In conjunction with this ruling, the Court will issue a separate order amending the March 6, 2013 Order 15 to correct the inaccuracy noted by plaintiffs. Signed by Judge Julie E. Carnes on 2/14/14. (ddm) (Entered: 02/18/2014) |
| 02/18/2014 | 24 | AMENDED ORDER AND OPINION denying defendants Motion to Dismiss and Compel Arbitration 4 and granting as unopposed defendant Covenant Dove Holding Company, LLCs Motion to Dismiss for Lack of Personal Jurisdiction 3 . The Court directs the parties to submit a joint preliminary report and discovery plan by Monday, March 17, 2014. The Court further instructs the parties and the Clerk that this Amended Order should supplant the Courts previous Order 15 addressing the Motions to Dismiss 3 and 4 . Signed by Judge Julie E. Carnes on 2/14/14. (ddm) (Entered: 02/18/2014) |
| 02/24/2014 | 25 | NOTICE OF APPEAL as to 24 Order,, 23 Order on Motion to Amend, Order on Motion for Clarification,, by Ark Holding Company, Inc., Ark Holdings, LLC, Covenant Dove, Inc., Covenant Dove, LLC, HMR Advantage Health Systems, Inc., Parkwood Living Center, LLC, Parkwood Nursing & Rehabilitation Center, Inc., Scepter Health & Rehab of Snellville, LLC. Filing fee $ 505, receipt number 113E-5040325. Transcript Order Form due on 3/10/2014 (Rissler, W.) (Entered: 02/24/2014) |
| 02/25/2014 | 26 | NOTICE Of Filing of NOA Transmittal Letter re: 25 Notice of Appeal. (pjm) (Entered: 02/25/2014) |
| 02/25/2014 | 27 | Transmission of Certified Copy of Notice of Appeal, Judgment, Order and Docket Sheet to US Court of Appeals re: 25 Notice of Appeal. (pjm) (Entered: 02/25/2014) |
| 03/03/2014 | 28 | USCA Acknowledgment of 25 Notice of Appeal filed by HMR Advantage Health Systems, Inc., Ark Holdings, LLC, Scepter Health & Rehab of Snellville, LLC, Ark Holding Company, Inc., Covenant Dove, LLC, Parkwood Nursing & Rehabilitation Center, Inc., Covenant Dove, Inc., Parkwood Living Center, LLC. Case Appealed to USCA - 11th Circuit. USCA Case Number 14-10794-FF. (kac) (Entered: 03/03/2014) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/11/2014 15:33:30 | | | |
| **PACER Login:** | ag0056 | **Client Code:** | jrk-22334-8 |
| **Description:** | Docket Report | **Search Criteria:** | 1:12-cv-01399-JEC |
| **Billable Pages:** | 7 | **Cost:** | 0.70 |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SHERVON HOGSETT, Individually, and
as Administratrix of the Estate of Patricia
Joyner, deceased, and GARY JOYNER,
Individually

      Plaintiffs,

         v.

Parkwood Nursing & Rehabilitation Center,
Inc., Parkwood Living Center, LLC, HMR
Advantage Health Systems, Inc., Scepter
Health & Rehab of Snellville, LLC,
Covenant Dove, Inc., Covenant Dove, LLC,
Covenant Dove Holding Company, LLC,
Ark Holding Company, Inc., and Ark
Holdings, LLC.

      Defendants.

CIVIL ACTION NO. _____

STATE COURT OF FULTON
COUNTY CIVIL ACTION
NO. 12-EV-014630-C

## NOTICE OF REMOVAL

Notice is hereby given that Defendants Parkwood Nursing & Rehabilitation

Center, Inc., Parkwood Living Center, LLC, HMR Advantage Health Systems,

Inc., Scepter Health & Rehab of Snellville, LLC, Covenant Dove, LLC, Covenant

Dove Holding Company, LLC, and Ark Holding Company, Inc. (collectively the

"Defendants")[1] remove to this Court pursuant to 28 U.S.C. §§ 1441 (a) and (b) and 1446 that civil action filed in the State Court of Fulton County, Georgia, styled as <u>Shervon Hogsett, Individually, and as Administratrix of the Estate of Patricia Joyner, deceased, and Gary Joyner, Individually v. Parkwood Nursing & Rehabilitation Center, Inc., Parkwood Living Center, LLC, HMR Advantage Health Systems, Inc., Scepter Health & Rehab of Snellville, LLC, Covenant Dove, LLC, Covenant Dove Holding Company, LLC, and Ark Holding Company, Inc.,</u> Civil Action No. 12-EV-014630-C.   In support whereof, Defendants show this Court as follows:

(a)    this Notice of Removal is timely as it has been filed within thirty (30) days of the receipt of Plaintiffs' Complaint by service, such Complaint having first been served on one of the Defendants on March 24, 2012;

(b)    true copies of all pleadings served by or upon Defendants in the state action are attached to this Notice of Removal as Exhibit "A" and are incorporated herein by reference;

---

[1]    Covenant Dove, Inc. and Ark Holdings, LLC are improperly named defendants, as they are no longer active entities.

(c)    in accordance with 28 U.S.C. § 1446(d), Defendants will give written notice hereof to Plaintiff and will file a copy of this Notice of Removal with the Clerk of the State Court of Fulton County, Georgia;

(d)    this Court has jurisdiction in this case pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, in that this litigation seeks the recovery of damages for pain and suffering, medical expenses, and other damages;

(e)    jurisdiction is further proper because complete diversity of citizenship exists between Plaintiffs and Defendants in that:

(i)    Plaintiffs are citizens of the State of Georgia;

(ii)    Defendants Parkwood Nursing and Rehabilitation Center, Inc. and HMR Advantage Health Systems, Inc. are South Carolina entities with their principal places of business in Easley, South Carolina;

(iii)    Defendant Ark Holding Company, Inc. is a Delaware entity with its principal place of business in Memphis, Tennessee;

(iv)    Defendant Parkwood Living Center, LLC, is a South Carolina entity with its member being First Skilled Holding Company,

Inc. (f/k/a Advantage Health Group, Inc.), a South Carolina entity with its principal place of business in Easley, South Carolina;[2]

(v)     Scepter Health & Rehab of Snellville, LLC, is a Delaware entity with its member, Olive Leaf, LLC also being a Delaware entity;[3]

(vi)    Covenant Dove, LLC, is a Delaware entity with its member, Covenant Dove Holding Company, LLC also being a Delaware entity;

(viii)  Covenant Dove Holding Company, LLC is a Delaware entity with its member being Ark Holding Company, Inc.; and,

(ix)    Defendants Covenant Dove, Inc. and Ark Holdings, LLC no longer exist.

**WHEREFORE**, Defendants respectfully request the following relief:

(a)     that the above-referenced action now pending in the State Court of Fulton County, Georgia be removed to the United

---

[2]     See L.P. v. Comcast SCH Holdings LLC, 374 F.3d 1020, 1022 (11th Cir. 2004) (holding that citizenship of a limited liability company is determined by the citizenship of its members).

[3]     Olive Leaf, LLC's member is Olive Leaf Holding Company, LLC, which is also a Delaware entity. Olive Leaf Holding Company, LLC's member is Ark Holding Company, Inc.

States District Court for the Northern District of Georgia,

Atlanta Division;

(b)    this Court accept jurisdiction of the action; and

(c)    that this action be placed on the docket of this Court for further

proceedings, the same as though this action had originally been

initiated in this Court.

(d)    that, once docketed, the Court stay this action and compel

Plaintiffs to arbitrate their claims in accordance with the

Agreement To Arbitrate signed by Shervon Hogsett,

individually and as the representative of Patricia Joyner.

Respectfully submitted this 23rd day of April, 2012.

                    ARNALL GOLDEN GREGORY LLP


                    /s/ **Jason E. Bring**
                    Jason E. Bring
                    Georgia Bar No. 082498
                    E-mail:  jason.bring@agg.com

                    Attorney for Defendants

171 17th Street, NW
Suite 2100
Atlanta, Georgia  30363
Telephone:  (404) 873-8500
Facsimile:  (404) 873-8501

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed **NOTICE OF REMOVAL** with the Clerk of the Court using the CM/ECF which will automatically send e-mail notifications of such filing to the following attorneys of record:

I hereby certify that I have mailed by United States Postal System the document to the following non-CM/ECF participants:

> Wayne D. Toth, Esq.
> The Toth Law Firm, LLC
> 400 Galleria Parkway, Suite 460
> Atlanta, Georgia  30339

This 23rd day of April, 2012.

> **/s/ Jason E. Bring**
> Jason E. Bring
> Georgia Bar No. 082498
> E-mail:  jason.bring@agg.com

ARNALL GOLDEN GREGORY LLP
171 17th Street, NW
Suite 2100
Atlanta, Georgia 30363
(404) 873-8500 (phone)
(404) 873-8501 (facsimile)

 CT Corporation

**Service of Process Transmittal**
03/26/2012
CT Log Number 520206137

TO:  Paula Malone
Covenant Dove, LLC
2723 Summer Oaks Drive
Bartlett, TN 38134

RE:  **Process Served in Georgia**

FOR:  Scepter Health & Rehab of Snellville, LLC (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Shervon Hogsett, Individually, and as Administratrix of the Estate of Patricia Joyner, deceased, and Gary Joyner, Individually, Pltfs. vs. Parkwood Nursing and Rehabilitation Center, Inc., et al., including Scepter Health & Rehab of Snellville, LLC, Dfts. |
| **DOCUMENT(S) SERVED:** | Summonses, Complaint, Affidavit, Attachment(s) |
| **COURT/AGENCY:** | Fulton County State Court, Fulton, GA<br>Case # 12EV014630 |
| **NATURE OF ACTION:** | Medical Injury - Improper Care and Treatment - Negligence per se based upon violation of requirements of the Georgia Bill of Rights for residents of long-term care facilities. |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Atlanta, GA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 03/26/2012 at 12:15 |
| **JURISDICTION SERVED :** | Georgia |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service, exclusive of the day of service |
| **ATTORNEY(S) / SENDER(S):** | Wayne D. Toth<br>The Toth Law Firm, LLC<br>400 Galleria Parkway Suite 460<br>Atlanta, GA 30339<br>404-250-1564 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  Fed Ex 2 Day , 798210326389<br>Image SOP<br>Email Notification, Rosemary L Corsetti rosemary.corsetti@bipc.com<br>Email Notification, Mary Haney mary.haney@bipc.com<br>Email Notification, Paula Malone pmalone@covenantdove.com<br>Email Notification, Debbie Ashley dashley@covenantdove.com |
| **SIGNED:**<br>**PER:**<br>**ADDRESS:**<br><br>**TELEPHONE:** | C T Corporation System<br>Tyeasha Harris<br>1201 Peachtree Street,N.E.<br>Atlanta, GA 30361<br>404-965-3840 |

Page 1 of  1 / CH

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 43225965
Date: Mar 21 2012  4:27PM
Mark Harper, Clerk

**GEORGIA, FULTON COUNTY**

DO NOT WRITE IN THIS SPACE

**STATE COURT OF FULTON COUNTY**
*Civil Division*

CIVIL ACTION FILE NO. _____

*** NOTE– DESIGNATED E-FILE CASE – ANSWER AND ALL PLEADINGS MUST BE E-FILED ****
CONTACT THE COURT AT 404.613.5040 AND
LEXISNEXIS CUSTOMER SUPPORT AT  1.888.529.7587

Shervon Hogsett, Individually, and as Administratrix of the Estate of Patricia Joyner, deceased, and Gary Joyner, Individually,

c/o Wayne D. Toth, The Toth Law Firm, LLC,
400 Galleria Parkway, Suite 460, Atlanta, GA 30339
Plaintiff's Name, Address, City, State, Zip Code

vs.

Scepter Health & Rehab of Snellville, LLC
c/o Registered Agent
CT Corporation System
1201 Peachtree Street, NE
Atlanta, Fulton County, Georgia 30361
Defendant's Name, Address, City, State, Zip Code

| TYPE OF SUIT | AMOUNT OF SUIT |
|---|---|
| [ ] ACCOUNT | PRINCIPAL $_____ |
| [ ] CONTRACT | |
| [ ] NOTE | INTEREST $_____ |
| [ ] TORT | |
| [ ] PERSONAL INJURY | ATTY. FEES $_____ |
| [ ] FOREIGN JUDGMENT | |
| [ ] TROVER | COURT COST $ _____ |
| [ ] SPECIAL LIEN | |
| ************ | |
| [ ] NEW FILING | |
| [ ] RE-FILING:  PREVIOUS CASE NO. _____ | |

### SUMMONS

TO THE ABOVE NAMED-DEFENDANT:

You are hereby required to file with the Clerk of said court and to serve a copy on the Plaintiff's Attorney, or on Plaintiff if no Attorney, to-wit:

Name: Wayne D. Toth, The Toth Law Firm, LLC

Address:  400 Galleria Parkway, Suite 460 _____

City, State, Zip Code:  Atlanta, GA 30339 _____        Phone No.: (404) 250-1564 _____

An answer to the complaint which is herewith served on you, within thirty (30) days after service on you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint, plus cost of this action. **DEFENSE MAY BE MADE & JURY TRIAL DEMANDED,** via electronic filing through LexisNexis or, if desired, at the e-filing public access terminal in the Clerk's Office at 185 Central Ave., S.W., Room TG100, Atlanta, GA 30303.

This  21st day of March, 2012 _____        Angela Dash Jones, Chief Deputy Clerk (electronic signature)

If the sum claimed in the suit, or value of the property sued for, is $300.00 or more Principal, the defendant must admit or deny the paragraphs of plaintiff's petition by making written Answer.  Such paragraphs undenied will be taken as true.  If the plaintiff's petition is sworn to, or if suit is based on an unconditional contract in writing, then the defendant's answer must be sworn to.

If the principal sum claimed in the suit, or value of the property sued for, is less than $300.00, and is on a note, unconditional contract, account sworn to, or the petition sworn to, defense must be made by filing a sworn answer setting up the facts relied on as a defense.

*SERVICE INFORMATION:*
Served , this  26  day of  March , 20 12 .        _____ R. Vean #471
                                              DEPUTY MARSHAL, STATE COURT OF FULTON COUNTY

WRITE VERDICT HERE:
We, the jury, find for _____

_____

This _____ day of _____, 20____.    _____ Foreperson
                              **(STAPLE TO FRONT OF COMPLAINT)**

Case 1:12-cv-01399-JEC    Document 1-1    Filed 04/23/12    State Court of Fulton County
***EFILED***

**GEORGIA, FULTON COUNTY**

DO NOT WRITE IN THIS SPACE

LexisNexis Transaction ID: 43225965
Date: Mar 21 2012  4:27PM
Mark Harper, Clerk

**STATE COURT OF FULTON COUNTY**
Civil Division

CIVIL ACTION FILE NO. _____

*** NOTE-- DESIGNATED E-FILE CASE – ANSWER AND ALL
PLEADINGS MUST BE E-FILED ****
CONTACT THE COURT AT 404.613.5040 AND
LEXISNEXIS CUSTOMER SUPPORT AT  1.888.529.7587

Shervon Hogsett, Individually, and as Administratrix of the
Estate of Patricia Joyner, deceased, and Gary Joyner,
Individually,
c/o Wayne D. Toth, The Toth Law Firm, LLC,
400 Galleria Parkway, Suite 460, Atlanta, GA 30339
Plaintiff's Name, Address, City, State, Zip Code

vs.

Scepter Health & Rehab of Snellville, LLC
c/o Registered Agent
CT Corporation System
1201 Peachtree Street, NE
Atlanta, Fulton County, Georgia 30361
Defendant's Name, Address, City, State, Zip Code

| TYPE OF SUIT | AMOUNT OF SUIT |
|---|---|
| [ ] ACCOUNT | PRINCIPAL $_____ |
| [ ] CONTRACT | |
| [ ] NOTE | INTEREST $_____ |
| [ ] TORT | |
| [ ] PERSONAL INJURY | ATTY. FEES $_____ |
| [ ] FOREIGN JUDGMENT | |
| [ ] TROVER | COURT COST $ _____ |
| [ ] SPECIAL LIEN | ************ |
| [ ] NEW FILING | |
| [ ] RE-FILING:  PREVIOUS CASE NO. _____ | |

## SUMMONS

TO THE ABOVE NAMED-DEFENDANT:

 You are hereby required to file with the Clerk of said court and to serve a copy on the Plaintiff's Attorney, or on Plaintiff if no Attorney, to-wit:

Name: Wayne D. Toth, The Toth Law Firm, LLC

Address:  400 Galleria Parkway, Suite 460_____

City, State, Zip Code:  Atlanta, GA 30339_____    Phone No.:  (404) 250-1564_____

An answer to the complaint which is herewith served on you, within thirty (30) days after service on you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint, plus cost of this action. **DEFENSE MAY BE MADE & JURY TRIAL DEMANDED,** via electronic filing through LexisNexis or, if desired, at the e-filing public access terminal in the Clerk's Office at 185 Central Ave., S.W., Room TG100,  Atlanta, GA 30303.

This  21st day of March, 2012_____    Angela Dash Jones, Chief Deputy Clerk (electronic signature)

 If the sum claimed in the suit, or value of the property sued for, is $300.00 or more Principal, the defendant must admit or deny the paragraphs of plaintiff's petition by making written Answer.  Such paragraphs undenied will be taken as true.  If the plaintiff's petition is sworn to, or if suit is based on an unconditional contract in writing, then the defendant's answer must be sworn to.
 If the principal sum claimed in the suit, or value of the property sued for, is less than $300.00, and is on a note, unconditional contract, account sworn to, or the petition sworn to, defense must be made by filing a sworn answer setting up the facts relied on as a defense.

## SERVICE INFORMATION:

Served , this _____ day of _____, 20_____.    _____

DEPUTY MARSHAL, STATE COURT OF FULTON COUNTY

WRITE VERDICT HERE:
We, the jury, find for _____

_____

This _____ day of _____, 20_____.    _____ Foreperson

(STAPLE TO FRONT OF COMPLAINT)

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 43225965
Date: Mar 21 2012  4:27PM
Mark Harper, Clerk

**GEORGIA, FULTON COUNTY**                    DO NOT WRITE IN THIS SPACE

**STATE COURT OF FULTON COUNTY**
**Civil Division**

CIVIL ACTION FILE NO. _____

*** NOTE-- DESIGNATED E-FILE CASE – ANSWER AND ALL
PLEADINGS MUST BE E-FILED ****
CONTACT THE COURT AT 404.613.5040 AND
LEXISNEXIS CUSTOMER SUPPORT AT  1.888.529.7587

Shervon Hogsett, Individually, and as Administratrix of the
Estate of Patricia Joyner, deceased, and Gary Joyner,
Individually, _____

c/o Wayne D. Toth, The Toth Law Firm, LLC,
400 Galleria Parkway, Suite 460, Atlanta, GA 30339
Plaintiff's Name, Address, City, State, Zip Code

vs.

Scepter Health & Rehab of Snellville, LLC
c/o Registered Agent
CT Corporation System
1201 Peachtree Street, NE
Atlanta, Fulton County, Georgia 30361
Defendant's Name, Address, City, State, Zip Code

| TYPE OF SUIT | AMOUNT OF SUIT |
|---|---|
| [  ] ACCOUNT | PRINCIPAL $_____ |
| [  ] CONTRACT | |
| [  ] NOTE | INTEREST $_____ |
| [  ] TORT | |
| [  ] PERSONAL INJURY | ATTY. FEES $_____ |
| [  ] FOREIGN JUDGMENT | |
| [  ] TROVER | COURT COST $ _____ |
| [  ] SPECIAL LIEN | |
| | ************ |
| [  ] NEW FILING | |
| [  ] RE-FILING: PREVIOUS CASE NO. _____ | |

**SUMMONS**

TO THE ABOVE NAMED DEFENDANT:

You are hereby required to file with the Clerk of said court and to serve a copy on the Plaintiff's Attorney, or on Plaintiff if no Attorney, to-wit:

Name: Wayne D. Toth, The Toth Law Firm, LLC

Address:  400 Galleria Parkway, Suite 460 _____

City, State, Zip Code: Atlanta, GA 30339 _____    Phone No.: (404) 250-1564 _____

An answer to the complaint which is herewith served on you, within thirty (30) days after service on you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint, plus cost of this action. **DEFENSE MAY BE MADE & JURY TRIAL DEMANDED**, via electronic filing through LexisNexis or, if desired, at the e-filing public access terminal in the Clerk's Office at 185 Central Ave., S.W., Room TG100,  Atlanta, GA 30303.

This  21st day of March, 2012 _____    Angela Dash Jones, Chief Deputy Clerk (electronic signature)

If the sum claimed in the suit, or value of the property sued for, is $300.00 or more Principal, the defendant must admit or deny the paragraphs of plaintiff's petition by making written Answer.  Such paragraphs undenied will be taken as true.  If the plaintiff's petition is sworn to, or if suit is based on an unconditional contract in writing, then the defendant's answer must be sworn to.

If the principal sum claimed in the suit, or value of the property sued for, is less than $300.00, and is on a note, unconditional contract, account sworn to, or the petition sworn to, defense must be made by filing a sworn answer setting up the facts relied on as a defense.

**SERVICE INFORMATION:**

Served , this _____ day of _____, 20_____.
_____
DEPUTY MARSHAL, STATE COURT OF FULTON COUNTY

WRITE VERDICT HERE:
We, the jury, find for _____

_____

This _____ day of _____, 20____.  _____ Foreperson
(STAPLE TO FRONT OF COMPLAINT)

Click to Print

## Transaction 43225965

**Case number:** 12EV014630C

Filed only at 3/21/2012 4:27 PM EDT

**Case name:** Hogsett, Shervon Deceased vs Parkwood Nursing & Rehabilitation Center Inc

No calendar event scheduled

**Court:** GA State Court of Fulton County

**Judge:** Dixon, Myra

2012 MAR 23 PM 1:40

### ⊟ Document List (12)     Total Statutory Fees: $431.50

**Main Document, 1 page   ID: 55743661**

| | | | |
|---|---|---|---|
| **Document type:** | General Civil Case Filing Information Form | **Clerk review status/action:** | Accepted |
| **Security:** | Public | **Date reviewed:** | 3/22/2012 |
| **Statutory fee:** | $0.00 | | |
| **Document title:** | General Case Information Form - Unable to list all Defendants due to space limitations. | | |

**Main Document, 1 page   ID: 55743662**

| | | | |
|---|---|---|---|
| **Document type:** | Summons with Service(See Resource Center for form) | **Clerk review status/action:** | Accepted |
| **Security:** | Public | **Date reviewed:** | 3/22/2012 |
| **Statutory fee:** | $25.00 | | |
| **Document title:** | Summons for Ark Holding Co., Inc. | | |

**Main Document, 1 page   ID: 55743663**

| | | | |
|---|---|---|---|
| **Document type:** | Summons with Service(See Resource Center for form) | **Clerk review status/action:** | Accepted |
| **Security:** | Public | **Date reviewed:** | 3/22/2012 |
| **Statutory fee:** | $25.00 | | |
| **Document title:** | Summons for Parkwood Living Center | | |

**Main Document, 1 page   ID: 55743665**

| | | | |
|---|---|---|---|
| **Document type:** | Summons with Service(See Resource Center for form) | **Clerk review status/action:** | Accepted |
| **Security:** | Public | **Date reviewed:** | 3/22/2012 |
| **Statutory fee:** | $25.00 | | |
| **Document title:** | Summons for Scepter Health & Rehab of Snellville, LLC | | |

**Main Document, 1 page   ID: 55743667**

| | | | |
|---|---|---|---|
| **Document type:** | Summons with Service(See Resource Center for form) | **Clerk review status/action:** | Accepted |
| **Security:** | Public | **Date reviewed:** | 3/22/2012 |
| **Statutory fee:** | $25.00 | | |
| **Document title:** | Summons for Covenant Dove, Inc. | | |

|  |  |  |  |
|---|---|---|---|
| **Security:** | Public | **Date reviewed:** | 3/22/2012 |
| **Statutory fee:** | $0.00 | | |
| **Document title:** | OCGA 9-11-9.1 Affidavit of Plaintiffs' Counsel | | |

## ⊟ Other Transaction Data

**Transaction Comment:**
None

**Financial Comment:**
None

**Client matter code**
Joyner v Parkwood

## ⊟ Parties and Recipients

### ⊟ Sending Parties (2)

1-2 of 2 sending parties

| Party | Party Type | Attorney | Attorney Type | Firm |
|---|---|---|---|---|
| Hogsett, Shervon | Plaintiff | Toth, Wayne | Attorney in Charge | Toth Law Firm LLC |
| Joyner, Gary | Plaintiff | Toth, Wayne | Attorney in Charge | Toth Law Firm LLC |

1-2 of 2 sending parties

### ⊟ Courtesy Copy Recipients (0)

none available

## ⊟ Sender Information

Submitted by:        Wayne Toth, Toth Law Firm LLC

Authorizer:          Wayne Toth, Toth Law Firm LLC

Case 1:12-cv-01399-JEC   Document 1-1   Filed 04/23/12   State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 43225965
Date: Mar 21 2012  4:27PM
Mark Harper, Clerk

## IN THE STATE COURT OF FULTON COUNTY
## STATE OF GEORGIA

Shervon Hogsett, Individually, and as
Administratrix of the Estate of Patricia Joyner,
deceased, and Gary Joyner, Individually,

    Plaintiffs,

vs.

                                  CIVIL ACTION FILE NO:

Parkwood Nursing and Rehabilitation
Center, Inc., Parkwood Living Center,
LLC, HMR Advantage Health
Systems, Inc., Scepter Health & Rehab of
Snellville, LLC, Covenant Dove, Inc.,
Covenant Dove, LLC, Covenant Dove Holding
Company, LLC, Ark Holding Company, Inc.,
and Ark Holdings, LLC,

    Defendants.

## COMPLAINT

    Shervon Hogsett, Individually, and as Administratrix of the estate of her mother, Patricia

Joyner, deceased, and Gary Joyner, Individually, present their Complaint, showing the Court and

jury as follows:

### PARTIES, JURISDICTION AND VENUE

1.

    Plaintiff Shervon Hogsett is the Administratrix of the Estate of Patricia Joyner, and is

therefore authorized to bring this action for the pain and suffering, medical, and funeral expenses

of Patricia Joyner.

2.

Plaintiff Shervon Hogsett is the surviving daughter of the decedent, Patricia Joyner, and is entitled to bring this action for the wrongful death of her mother.

3.

Plaintiff Gary Joyner is the surviving son of the decedent, Patricia Joyner, and is entitled to bring this action for the wrongful death of his mother.

4.

Defendant Parkwood Living Center, LLC is a foreign limited liability company formed under the laws of the State of South Carolina that is authorized to and conducts business in the State of Georgia. Defendant can be served through its registered agent for service of process in the State of Georgia: CT Corporation System, 1201 Peachtree Street, NE, Atlanta, Fulton County, Georgia 30361.

5.

Defendant Parkwood Living Center, LLC is subject to the jurisdiction of this Court.

6.

Venue is proper as to Defendant Parkwood Living Center, LLC.

7.

Defendant Parkwood Nursing and Rehabilitation Center, Inc. is a foreign profit corporation formed under the laws of the State of South Carolina that is duly authorized to and conducts business in the State of Georgia. Defendant can be served with process by the means set out under O.C.G.A. §14-2-1520 by service upon the Georgia Secretary of State and notice provided via certified mail to John F. Swift, Chief Financial Officer, P.O. Box 222, 8595 Pelham Road, Greenville, SC 29615.

8.

Defendant Parkwood Nursing and Rehabilitation Center, Inc. is subject to the jurisdiction of this Court.

9.

Venue is proper as to Defendant Parkwood Nursing and Rehabilitation Center, Inc.

10.

Defendant HMR Advantage Health Systems, Inc. is a for profit corporation formed under the laws of the State of South Carolina. Defendant transacts significant business in the State of Georgia, but it maintains no registered agent for service of process in this state. Its principal place of business in the State of Georgia is located at 3000 Lenora Church Road, Snellville, Georgia 30078. Pursuant to O.C.G.A. §9-10-94 and S.C. Code Ann. §15-9-210, this Defendant can be served with process via certified mail to its Chief Financial Officer and registered agent for service in the State of South Carolina: John F. Swift; HMR Advantage Health Systems, Inc., 101 Grace Drive, Easley, SC 29640.

11.

Defendant HMR Advantage Health Systems, Inc. is subject to the jurisdiction of this Court.

12.

Venue is proper as to Defendant HMR Advantage Health Systems, Inc.

13.

Defendant Scepter Health & Rehab of Snellville, LLC is a foreign limited liability company formed under the laws of the State of Delaware that is duly authorized to and conducts business in the State of Georgia. Defendant can be served through its registered agent for service

of process in the State of Georgia: CT Corporation System, 1201 Peachtree Street, NE, Atlanta, Fulton County, Georgia 30361.

14.

Defendant Scepter Health & Rehab of Snellville, LLC is subject to the jurisdiction of this Court.

15.

Venue is proper as to Defendant Scepter Health & Rehab of Snellville, LLC.

16.

Defendant Covenant Dove Holding Company, LLC is a foreign limited liability company formed under the laws of the State of Delaware. Defendant transacts significant business in the State of Georgia, but it maintains no registered agent for service of process in this state. Its principal place of business in the State of Georgia is located at 3000 Lenora Church Road, Snellville, Georgia 30078.  Pursuant to O.C.G.A. §9-10-94 and Tenn. Code Ann. §16-15-903, this Defendant can be served with process via certified mail to its registered agent for service in the State of Tennessee: CT Corporation System, Suite 2021, 800 S. Gay Street, Knoxville, TN 37929-9710; and Lawrence Deering, Chief Executive Officer, Covenant Dove Holding Company, LLC, 2723 Summer Oaks Drive, Bartlett, TN 38134.

17.

Defendant Covenant Dove Holding Company, LLC is subject to the jurisdiction of this Court.

18.

Venue is proper as to Defendant Covenant Dove Holding Company, LLC.

19.

Defendant Covenant Dove, LLC is a foreign limited liability company formed under the laws of the State of Delaware. Defendant transacts significant business in the State of Georgia, but it maintains no registered agent for service of process in this state. Its principal place of business in the State of Georgia is located at 3000 Lenora Church Road, Snellville, Georgia 30078. Pursuant to O.C.G.A. §9-10-94 and Tenn. Code Ann. §16-15-903, this Defendant can be served with process via certified mail to its registered agent for service in the State of Tennessee: CT Corporation System, Suite 2021, 800 S. Gay Street, Knoxville, TN 37929-9710; and Lawrence Deering, Chief Executive Officer, Covenant Dove Holding Company, LLC, 2723 Summer Oaks Drive, Bartlett, TN 38134.

20.

Defendant Covenant Dove, LLC is subject to the jurisdiction of this Court.

21.

Venue is proper as to Defendant Covenant Dove, LLC.

22.

Defendant Covenant Dove, Inc. is a foreign profit corporation formed under the laws of the State of Tennessee. Defendant transacts significant business in the State of Georgia, but it maintains no registered agent for service of process in this state. Its principal place of business in the State of Georgia is located at 3000 Lenora Church Road, Snellville, Georgia 30078. Defendant can be served with process by the means set out under O.C.G.A. §14-2-1520 by service upon the Georgia Secretary of State and notice provided via certified mail to Judy Ullery, President, Covenant Dove, Inc., 475 Jack Kramer Drive, Memphis, TN 38117.

23.

Defendant Covenant Dove, Inc. is subject to the jurisdiction of this Court.

24.

Venue is proper as to Defendant Covenant Dove, Inc.

25.

Defendant Ark Holdings, LLC is a business formed under the laws of the State of Tennessee. Defendant transacts significant business in the State of Georgia, but it maintains no registered agent for service of process in this state. Its principal place of business in the State of Georgia is located at 3000 Lenora Church Road, Snellville, Georgia 30078.   Pursuant to O.C.G.A. §9-10-94 and Tenn. Code Ann. §16-15-903, this Defendant can be served with process via certified mail to its registered agent for service in the State of Tennessee: Gregory W. Snodgrass, 100 Deerfield Lane, Oak Ridge, TN 37830-8767; and Lawrence Deering, Chief Executive Officer, Ark Holdings, LLC, 100 Deerfield Lane, Oak Ridge, TN 37830-8767.

26.

Defendant Ark Holdings, LLC is subject to the jurisdiction of this Court.

27.

Venue is proper as to Defendant Ark Holdings, LLC.

28.

Defendant Ark Holding Company, Inc. is a foreign profit corporation formed under the laws of the State of Delaware.  Defendant can be served through its registered agent for service of process in the State of Georgia: CT Corporation System, 1201 Peachtree Street, NE, Atlanta, Fulton County, Georgia 30361.

29.

Defendant Ark Holding Company, Inc. is subject to the jurisdiction of this Court.

30.

Venue is proper as to Defendant Ark Holding Company, Inc.

31.

At all times material hereto, Defendants owned, operated, and/or managed a nursing, convalescent and rehabilitation facility located at 3000 Lenora Church Road, Snellville, Georgia 30078, called "Parkwood Nursing and Rehab Center" or "Parkwood Living Center." Hereinafter, the term "Parkwood" or "Parkwood (now known as Scepter Health & Rehab of Snellville)" or "Defendants" shall refer to all Defendants collectively. Parkwood was charged with responsibility for the provision of residence, care, treatment and convalescent services to Patricia Joyner from March 11, 2010, until March 24, 2010. Defendants negligently failed at their responsibilities as described below.

32.

At all times material hereto, Defendants had the right to control the time, manner and method of duties performed by the nurses, nurses' aides, administrator and other staff of Parkwood, and had the right to discharge the nurses, nurses' aides, administrator and other staff at the facility.

33.

At all times material hereto, the nurses, nurses' aides, administrator and other staff of Parkwood were agents of Parkwood, and were acting within the course and scope of their agency such that the negligence of the agents is imputed to Parkwood pursuant to the doctrine of *respondeat superior*.

34.

At all times material hereto, the nurses, nurses' aides, administrator and other staff of Parkwood were employed by Parkwood, and were acting within the course and scope of their employment such that the negligence of the employees is imputed to Parkwood pursuant to the doctrine of *respondeat superior*.

35.

Defendants are joint and several tortfeasors.

36.

All Counts in this Complaint incorporate, and by reference include, the paragraphs found in all other Counts and portions of this Complaint.

## FACTS

37.

Patricia Joyner was 63 years old when she was admitted to Parkwood on March 11, 2010. At the time of her admission, Ms. Joyner's primary diagnoses were ERSD, S/P left leg above the knee amputation, insulin dependent diabetes, anemia and hypothyroidism.

38.

Ms. Joyner's prognosis was listed as "fair" on the HMR Personal History and Physical Examination.

39.

Ms. Joyner's rehabilitative potential was listed as "fair" on the HMR Personal History and Physical Examination.

40.

The Physical Therapy Progress Report listed Ms. Joyner's Long Term Goal to be independent with bed mobility, transfers and W/C mobility. Her Discharge Plans were to discharge home with caregiver assist.

41.

On March 19, 2010, Dr. Charles Moomey wrote recommendations for dressing Ms. Joyner's left above-the-knee amputation.

42.

New orders were not written by Parkwood until March 22, 2010.

43.

Dr. Moomey's treatment recommendations were never implemented by the Defendant.

44.

Despite Dr. Moomey's concern about the state of the wounds at Ms. Joyner's left above-the-knee amputation, Defendants never updated her Non-Pressure Ulcer Summary after March 19, 2010, indicating a complete lack a concern by the Defendants about the state of Ms. Joyner's wounds.

45.

On March 21, 2010, the Nurse's Notes showed that Ms. Joyner was alert, and able to make her needs known. This was the last Nurse's Note reflecting that Ms. Joyner was alert.

46.

On March 22, 2010, Defendants noted a decline in Ms. Joyner's buttock wounds, and that she was refusing meals.

47.

On March 22, 2010, Ms. Joyner was sent off-site via ambulance to receive dialysis treatment.

48.

On March 24, 2010, due to her deteriorating condition and unresponsiveness to verbal stimuli, Ms. Joyner was sent to Emory Eastside Medical Center.

49.

On March 24, 2010, at Emory Eastside Medical Center, Ms. Joyner's admitting diagnosis was: Sepsis, source is infected left AKA stump; gangrene of the left AKA stump; Non-ST-elevation myocardial infarction with borderline elevated troponin; Stage 3 decubitus ulcer on the sacrum; severe cachexia and malnutrition; severe peripheral vascular disease with failed femoral-popliteal bypass graft per verbal report; diabetes mellitus type 2, poorly controlled; and hypotension secondary to sepsis.

50.

The admitting physician, Fauzia Rafat Shah, M.D. stated in his March 24, 2010, History & Physical that the staff at the nursing home noted the stump getting infected, and that the stump was getting black and gangrenous. Dr. Shah also noted that Ms. Joyner was in an extreme degree of pain.

51.

On March 26, 2010, Ms. Joyner died. The immediate cause of death was sepsis, due to, or as a consequence of gangrene - left above the knee amputation.

52.

A period of limitation will expire, or there is a good faith basis to believe it will expire, on Plaintiffs' claims within ten (10) days.

53.

Because of time constraints, an affidavit of an expert could not be prepared before the period of limitation expires.

54.

Pursuant to O.C.G.A. 9-11-9.1(b), the Affidavit of undersigned counsel is being filed contemporaneously with this lawsuit.

## COUNT I
## PROFESSIONAL NEGLIGENCE

55.

Patricia Joyner entered into a contract with the Defendants for the provision of long-term residence, care, treatment and services at the Defendants' facility, and Defendants failed to provide that care, treatment and service as described herein.

56.

The Defendants owed a duty to Patricia Joyner to exercise that degree of care and skill ordinarily exercised by health care providers generally and under like conditions and similar surrounding circumstances.

57.

The Defendants were negligent and deviated from the standard of care ordinarily exercised by health care providers generally and under like conditions and similar surrounding circumstances by failing to deliver a minimum level of nursing care to Patricia Joyner from March 11, 2010, through March 24, 2010.

58.

As a direct and proximate result of the Defendants' acts and omissions which breached

the standards of care required of long-term care facility nursing staff, Patricia Joyner sustained

injury, pain and suffering, and ultimately death.

59.

All of the Defendants' staff's acts and omissions described above constitute professional

negligence as a result of which the Plaintiff is entitled to recover from the Defendants as set out

below.

### COUNT II
### NEGLIGENCE PER SE BASED UPON VIOLATION OF REQUIREMENTS OF THE GEORGIA BILL OF RIGHTS FOR RESIDENTS OF LONG-TERM CARE FACILITIES AT O.C.G.A. § 31-8-100 *et seq.*

60.

O.C.G.A. §§31-8-100 *et seq.* set out requirements for those providing care, treatment and

services to residents of long-term care facilities in this state.  O.C.G.A. §31-8-108(a) requires

that residents of long-term care facilities receive care, treatment and services that are adequate

and appropriate, and which must be provided with reasonable care and skill and in compliance

with all applicable laws and regulations (including those listed in all other Counts of this

Complaint), and with respect for the resident's personal dignity, among other requirements.

61.

Pursuant to its authority granted by statute, the Georgia Department of Human Resources

has promulgated regulations for the provision of care, treatment and services to residents of long-

term care facilities.  GA ADC 290-5-39-.07 requires that each resident be provided with care,

treatment and services which are adequate and appropriate for the condition of the resident as

determined by the resident's developing care plan. The regulation also requires that services be provided with reasonable care and skill and in compliance with all applicable laws and regulations.

62.

The Defendants violated the provisions of the Georgia Bill of Rights for Residents of Long Term Care Facilities and the regulations of the Georgia Department of Human Resources identified above in all of the acts and omissions that are described in this Complaint.

63.

Pursuant to O.C.G.A. §31-8-126(a), Plaintiffs have a cause of action for damages against the Defendants as a result of Defendants' violations of the rights granted under the Georgia Bill of Rights for Residents of Long Term Care Facilities, such as those identified under O.C.G.A. §31-8-108(a).

64.

As a proximate result of Defendants' violations of the Georgia Bill of Rights for Residents of Long Term Care Facilities and the regulations of the Georgia Department of Human Resources, Patricia Joyner suffered serious and debilitating injuries and death.

65.

As a result of the Defendants' acts and omissions in violation of the patient's Bill of Rights, and the resultant damages and harm, the Plaintiffs are entitled to an award of damages in their individual and representative capacities as set out above.

<u>COUNT III</u>
<u>NEGLIGENCE *PER SE* BASED UPON VIOLATION OF REQUIREMENTS
FOR LONG TERM CARE FACILITIES AT 42 CFR § 483.1 *et seq.*</u>

66.

Parkwood (now known as Scepter Health & Rehab of Snellville, Inc.) is a licensed and certified long-term care facility that provides skilled nursing care as a participant in the Medicare program and that provides nursing care as a participant in the Medicaid program. Defendants receive funding under the Medicare and Medicaid programs.

67.

The U.S. Department of Health & Human Services has promulgated a number of regulations pursuant to its authority under OBRA at 42 USCA §1395i-3 related to the care, treatment and services provided to residents of skilled nursing facilities participating in the Medicare program, and nursing facilities participating in the Medicaid program. Among those regulations are the following:

a) 42 CFR §483.10 and 15(a) provide that the resident has a right to live a dignified existence;

b) 42 CFR §483.10(c) requires the facility to implement protocols to protect the resident from neglect;

c) 42 CFR §483.10(c)(2) requires that all instances of patient neglect be reported to the facility administrator and other officials in accordance with state law;

d) 42 CFR §483.13(c)(3) requires that the facility maintain evidence of its investigation into patient neglect and must prevent future neglect of patients;

e) 42 CFR §483.13(c)(4) requires that results of neglect investigation be reported to the administrator and appropriate state authorities;

f) 42 CFR §483.15 requires the facility to care for its residents in a manner that maintains and enhances the resident's quality of life;

g) 42 CFR §483.15(e)(1) requires that each resident be provided services in the facility to accommodate their individual needs;

h) 42 CFR §483.20(b) and (g) require the facility to maintain a comprehensive and accurate assessment of the resident's medical needs, including the resident's general health, physical functioning and skin condition;

i) 42 CFR §483.20(k)(1) requires that the facility prepare an accurate comprehensive care plan that addresses the patient's medical and nursing needs;

j) 42 CFR §483.20(k)(3) requires that services provided or arranged by the facility meet professional standards of quality and be provided by qualified persons;

k) 42 CFR §483.25 requires the facility to provide services to attain and maintain the highest practicable physical, mental and psychosocial well being in accordance with the resident's assessments and Care Plan;

l) 42 CFR §483.30 requires the facility to maintain an adequate nursing staff;

m) 42 CFR §483.40(a) requires the facility to ensure that each patient's medical care is supervised by a physician;

n) 42 CFR §483.40 requires the facility to keep the resident's treating physician informed of their medical condition, and requires the facility to follow physician's orders;

o) 42 CFR §483.75 requires that the facility be administered in such a way as to use its resources effectively and efficiently to maintain the highest practicable physical, mental and psychosocial well being of each resident;

p)  42 CFR §483.75 requires properly trained, qualified and competent staff;

q)  42 CFR §483.75(b) requires the facility to operate and provide services in compliance with the law and acceptable professional standards and principles that apply to professionals providing said services;

r)  42 CFR §483.75(k)(1) requires the facility to maintain clinical records in accordance with accepted professional standards and practices which are complete and accurate; and

s)  42 CFR § 483.25(a)(1)(ii) requires the facility to ensure that, absent the presence of a clinical condition making a resident's diminution in ability unavoidable, that the resident's ability to transfer and ambulate does not diminish.

68.

As a licensed and certified long-term care facility which receives funding under the Medicare and Medicaid programs, Defendants' long term care facility is subject to the above federal regulations for the provision of care, treatment and services to residents of the facility.

69.

As described in this Complaint, Defendants violated the above regulations of the U.S. Department of Health and Human Services in the following acts and omissions, among others to be demonstrated by the evidence.

70.

The Defendants' acts and omissions constituting violation of the above-referenced federal regulations at 42 CFR §483.1 et seq. constitute negligence *per se.*

71.

Defendants' failure to comply with the above federal mandates led directly to the serious

injury, illness, infection, terrible pain, suffering, anguish, grief and death of Patricia Joyner.

72.

As a result of the Defendants' negligence *per se* and resultant damages and harm,

Plaintiffs are entitled to an award of damages in their individual and representative capacities as

set out below.

## COUNT IV
## STATUTORY REMEDIES FOR VIOLATION OF FEDERAL AND STATE STATUTES
## AND REGULATIONS IN THE OPERATION OF A PERSONAL CARE HOME

73.

Defendants' facility Parkwood (now known as Scepter Health & Rehab of Snellville) is a

"personal care home" as that term is defined under O.C.G.A. §31-7-12.

74.

Pursuant to O.C.G.A. §31-8-133, residents of personal care homes in Georgia have been

granted certain rights which are enumerated in the regulations promulgated by the Georgia

Department of Human Resources at GA ADC 290-5-35 *et seq.*

75.

Among the regulations promulgated by the Georgia Department of Human Resources for

the operation of personal care homes is GA ADC 290-5-35-.18 (currently GA ADC 111-8-62-

.26) which provides that each resident of a personal care home must receive care and services

which shall be adequate, appropriate and in compliance with applicable federal and state law and

regulations.

76.

Defendants violated regulations of the U.S. Department of Health and Human Services at 42 CFR 483.1 *et seq.*, the Georgia Bill of Rights for Residents of Long Term Care Facilities at O.C.G.A. §§31-8-100 *et seq.* and the regulations of the Georgia Department of Human Resources at GA ADC 290-5-35 *et seq.* and 290-5-39-.07. in the following acts and omissions, among others:

a) Defendants failed to administer the nursing facility in such a way as to use its resources effectively and efficiently to maintain the highest practicable physical, mental and psychosocial well-being of Ms. Joyner;

b) Defendants failed to implement protocols to protect Ms. Joyner from neglect;

c) Defendants failed to operate and provide services to Ms. Joyner in compliance with law and acceptable professional standards and principles that apply to professionals providing said services;

d) Defendants failed to provide or arrange services for Ms. Joyner that met professional standards of quality;

e) Defendants failed to maintain an adequate nursing staff to provide for Ms. Joyner's needs;

f) Defendants failed to provide properly trained, qualified and competent staff to care for Ms. Joyner;

g) Defendants failed to maintain complete and accurate clinical records related to the care and treatment of Ms. Joyner in accordance with accepted professional standards and practices;

h) Defendants failed consistently to make any effort to protect Ms. Joyner from neglect;

i)   Defendants failed in its duty to report all instances of Ms. Joyner's neglect to the facility administrator and appropriate state authorities;

j)   Defendants failed to report results of any neglect investigation to the Administrator and appropriate state authorities;

k)   Defendants failed to properly train and supervise the nursing staff to provide the appropriate care, treatment and services that Ms. Joyner needed;

l)   Defendants failed to communicate to Ms. Joyner's physician's her medical conditions;

m)   Defendants failed to follow physician's orders with respect to the care and treatment that Ms. Joyner needed;

n)   Defendants failed to provide prompt medical attention to Ms. Joyner when she needed it;

o)   Defendants failed to maintain a comprehensive and accurate assessment of Ms. Joyner's medical needs; and

p)   Defendants failed to ensure that, given the absence of a clinical condition making Ms. Joyner's diminution in ability unavoidable, that her ability to transfer and ambulate did not diminish.

77.

Pursuant to OCGA §31-8-136(a), Plaintiff Shervon Hogsett, as the Administrator of the Estate of Patricia Joyner, is entitled to an award of damages for each of the Defendants' individual violations of the regulations of the U.S. Department of Health and Human Services at 42 CFR 483.1 *et seq.,* the provisions of the Georgia Bill of Rights for Residents of Long Term Care Facilities at O.C.G.A. §§31-8-100 *et seq.,* and the regulations of the Georgia Department of Human Resources at GA ADC 290-*5-35 et seq.* and 290-5-39-.07.

78.

Alternatively, pursuant to O.C.G.A. §31-8-136(a), Plaintiff is entitled to an award of actual damages for each of the Defendants' violations of the federal and state law and regulations identified herein.

79.

As permitted under O.C.G.A. §31-8-136(c), Plaintiff asserts her cause of action in this Count of the Complaint in addition to all other rights, remedies and causes of action stated in this complaint.

80.

Pursuant to O.C.G.A. §31-8-136(a), Plaintiff Shervon Hogsett, as the Administrator of the Estate of Patricia Joyner is entitled to an award of punitive damages for each of the Defendants' individual and numerous acts and omissions in violation of the Federal and state law and regulations cited in this Complaint.

## COUNT V
## GENERAL NEGLIGENCE

81.

Defendants had a duty to exercise ordinary care in the provision of care, treatment and services to Ms. Joyner. The Defendants failed to exercise reasonable care in a number of instances with respect to the care, treatment and services provided to Ms. Joyner, and she sustained serious injuries, extreme pain and suffering, and death as a result.

82.

Defendants failed to establish and implement policies and procedures designed to provide appropriate care, treatment and services to Parkwood (now known as Scepter Health & Rehab of Snellville) residents, including Ms. Joyner.

83.

Defendants failed to properly prepare Parkwood's (now known as Scepter Health & Rehab of Snellville) budget so as to use its resources effectively and efficiently to maintain appropriate care treatment and services to its residents, including Ms. Joyner.

84.

Defendants failed to implement policies, practices and protocols to protect residents, including Ms. Joyner, from neglect.

85.

Defendants failed to operate and provide services to Ms. Joyner in compliance with acceptable professional standards and principles that apply to professionals providing said services.

86.

Defendants failed to maintain an adequate nursing and non-professional staff to provide for Ms. Joyner's needs.

87.

Defendants failed to provide properly trained, qualified and competent staff to care for Ms. Joyner.

88.

Defendants failed to properly train and supervise the Parkwood staff that was responsible for the provision of care, treatment and services to Ms. Joyner.

89.

As a direct and proximate result of each of the failures detailed above, Patricia Joyner endured serious injury, experienced tremendous pain and suffering, and died.

90.

Many of the Defendants' acts and omissions described herein are ministerial in nature and constitute simple negligence for which the Defendants are liable to the Plaintiffs.

91.

As a result of the foregoing acts and omissions and the resultant injuries, pain, and suffering of Patricia Joyner, Plaintiffs are entitled to recover from the Defendants.

## COUNT VI
## BREACH OF CONTRACT

92.

Patricia Joyner entered into a contract for the provision of long term nursing care, treatment and services with Defendants.

93.

In the wrongful acts and omissions described in the Complaint and in the insufficiency of care, treatment and services outlined herein, the Defendants failed to provide the services that they promised to provide pursuant to the contract for services entered between the Defendants and Patricia Joyner. The Defendants therefore breached the contract for services as set out herein.

94.

As a result of the foregoing, Plaintiff Shervon Hogsett, the Administrator of Patricia Joyner's estate is entitled to recover all amounts paid to obtain services under the contract and all consequential damages arising there from.

## COUNT VII
## ESTATE'S TORT CLAIMS

95.

Plaintiff Shervon Hogsett is the Administrator of the Estate of Patricia Joyner, and she prosecutes these claims in that capacity.

96.

Ms. Joyner sustained grievous injuries, pain, and suffering as a direct result of Defendants' acts and omissions, which constitute violations of federal and state law, professional negligence, general negligence and negligence *per se.*

97.

In her capacity as the Administrator of Ms. Joyner's estate, Plaintiff Shervon Hogsett is entitled to recover all damages to which Ms. Joyner would have been entitled had she survived. As a result of the Defendants' wrongful conduct, Ms. Joyner incurred medical, funeral and related expenses for her surgery, therapy and other care, treatment and services. Ms. Joyner also endured extreme pain and suffering as a result of Defendants' negligent acts and omissions while she was a resident at Parkwood (now known as Scepter Health & Rehab of Snellville).

98.

Based on the foregoing, Plaintiff Shervon Hogsett, as Administrator of Patricia Joyner's estate, is entitled to recover from Defendants damages equal to all expenses incurred in the

provision of medical care and treatment to Ms. Joyner resulting from the Defendants' wrongful conduct, and funeral expenses. Plaintiffs are also entitled to recover damages for Ms. Joyner's conscious pain and suffering.

## COUNT VIII
## IMPUTED LIABILITY

### 99.

All of Patricia Joyner's injuries and damages were the direct result of the acts and omissions of the agents, servants and employees of the Defendants' business entities, and were conducted within the course and scope of each individual's employment with the Defendants' business entities' healthcare providers.

### 100.

The Defendants' business entities are therefore vicariously liable for the individual employee's and agent's acts and omissions, and for each individual officer, director, employee, agent and servant's negligent acts and omissions, and the resultant injuries and damages of Patricia Joyner by application of the doctrine of *respondeat superior*. Plaintiffs are therefore entitled to recover damages from the Defendants.

## COUNT IX
## PUNITIVE DAMAGES

### 101.

The acts and omissions of the Defendants demonstrate fraud, intentional misconduct, willful and wanton misconduct, oppression, malice, and a conscious indifference to the consequences, including the safety and health of Patricia Joyner.

102.

The acts and omissions of the Defendants were accompanied by aggravating circumstances.

103.

Defendants are liable for punitive damages to Plaintiffs.

104.

Punitive damages should be awarded to Plaintiffs and against Defendants to punish Defendants and deter them from repeated misconduct as described in this Complaint.

WHEREFORE, Plaintiffs pray for the following:

a) That service of process be had upon each Defendant;

b) That Plaintiff Shervon Hogsett, as the Administrator of the Estate of Patricia Joyner, recover a judgment against the Defendants, jointly and severally, in an amount to be shown by the evidence at the trial of this case for the pain and suffering, medical expenses and funeral expenses of Patricia Joyner;

c) That judgment be entered against the Defendants in an amount in excess of $10,000.00, for the wrongful death of Patricia Joyner;

d) That Plaintiffs recover a judgment against Defendants for punitive damages in an amount sufficient to punish Defendants and deter Defendants from similar conduct in the future;

e) That all costs to be taxed against the Defendants;

f) That this case be tried before 12 fair and impartial jurors; and

g) That the Court grant Plaintiffs all other relief that it deems appropriate.

**Plaintiffs hereby demand a trial by a Jury of Twelve.**

This 21st day of March 2012.

THE TOTH LAW FIRM, LLC

Wayne D. Toth
Georgia Bar No. 714733
The Toth Law Firm, LLC
400 Galleria Parkway
Suite 460
Atlanta, GA 30339
(404) 250-1564
(404) 584-7002 (Fax)
*Attorney for Plaintiffs*

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 43225965
Date: Mar 21 2012 4:27PM
Mark Harper, Clerk

## IN THE STATE COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| Shervon Hogsett, Individually, and as Administratrix of the Estate of Patricia Joyner, deceased, and Gary Joyner, Individually, <br><br> Plaintiffs, <br><br> vs. <br><br> Parkwood Nursing and Rehabilitation Center, Inc., Parkwood Living Center, LLC, HMR Advantage Health Systems, Inc., Scepter Health & Rehab of Snellville, LLC, Covenant Dove, Inc., Covenant Dove, LLC, Covenant Dove Holding Company, LLC, Ark Holding Company, LLC, and Ark Holdings, LLC, <br><br> Defendants. | CIVIL ACTION FILE NO: |

---

### O.C.G.A. § 9-11-9.1(b) AFFIDAVIT OF WAYNE D. TOTH

---

**STATE OF GEORGIA**
**COUNTY OF COBB**

PERSONALLY appeared before the undersigned officer duly authorized to administer oaths, Wayne D. Toth, who upon oath deposes and says:

1.

My name is Wayne D. Toth. I am over the age of eighteen and otherwise competent to give this Affidavit. I am an attorney licensed to practice law in the State of Georgia. I am the sole Member of The Toth Law Firm, LLC, and I have personal knowledge of the matters contained in this Affidavit.

2.

Plaintiff Shervon Hogsett retained my law firm on February 14, 2012, to investigate and pursue claims arising out of the negligent nursing care Patricia Joyner received as a resident of Defendant Parkwood Nursing and Rehabilitation Center, Inc. and/or Parkwood Living Center, LLC (both now known as Scepter Health & Rehab of Snellville) from March 11, 2010, until March 24, 2010.

3.

Plaintiff Gary Joyner retained my law firm on March 9, 2012, to investigate and pursue claims arising out of the negligent nursing care Patricia Joyner received as a resident of Defendant Parkwood Nursing and Rehabilitation Center, Inc. and/or Parkwood Living Center, LLC (both now known as Scepter Health & Rehab of Snellville) from March 11, 2010, until March 24, 2010.

4.

I have a good faith basis to believe that the period of limitation on the claims stated in the contemporaneously filed Complaint for Damages expires on or about March 26, 2012, which is within ten (10) days of the date of filing this lawsuit.

5.

My law firm was *not* retained by Shervon Hogsett and/or Gary Joyner more than 90 days prior to the expiration of the period of limitation on the Plaintiffs' claims.

6.

This Affidavit is offered to and does satisfy the requirements of O.C.G.A. § 9-11-9.1(b).

FURTHER AFFIANT SAITH NOT.

*(Signatures appear on next page)*

This the 21st day of March, 2012.

_____
WAYNE B. TOTH

SWORN TO AND SUBSCRIBED before me
this the 21 ST day of March, 2012.

_____
Notary Public
My Commission Expires: _____

TRACY L. ALLEN
NOTARY
EXPIRES
GEORGIA
JULY 6, 2014
PUBLIC
CHEROKEE COUNTY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

SHERVON HOGSETT, Individually,
and as Administratrix of the Estate of
Patricia Joyner, deceased, and GARY
JOYNER, Individually

      Plaintiffs,

v.

Parkwood Nursing & Rehabilitation
Center, Inc., et al.,

      Defendants.

CASE NO. 1:12-cv-01399-JEC

## DEFENDANTS' MOTION TO DISMISS OR, ALTERNATIVELY, TO STAY PROCEEDINGS AND COMPEL ARBITRATION

NOW COME Defendants Parkwood Nursing & Rehabilitation Center, Inc.,

Parkwood Living Center, LLC, HMR Advantage Health Systems, Inc., Scepter

Health & Rehab of Snellville, LLC, Covenant Dove, LLC, Covenant Dove

Holding Company, LLC, and Ark Holding Company, Inc. (collectively the

"Defendants")[1] and pursuant to Georgia Rules of Civil Procedure 12(b)(1) and

12(b)(6), move to dismiss or, alternatively, to stay this proceeding and compel

---

[1]     Covenant Dove, Inc. and Ark Holdings, LLC are not properly named defendants as neither are active entities.  To the extent these are deemed misnomers or trade names of any of the other Defendants, they are joined in this Motion.

4684178v1

arbitration.  The parties to this action agreed that any disputes would be subject to mandatory arbitration pursuant to a written arbitration agreement, attached hereto as Exhibit A.   In support of this Motion, the Defendants rely upon their contemporaneously filed supporting brief, the declarations of Michael H. McBride and Zachary Wood, and all other matters of record.

Accordingly, the Court should dismiss or, alternatively, stay this proceeding and compel arbitration as to all Defendants.

This 30th day of April, 2012.

Respectfully submitted,

ARNALL GOLDEN GREGORY LLP

/s/ Jason E. Bring
Jason E. Bring
Georgia Bar No. 082498

171 17th Street, NW
Suite 2100
Atlanta, Georgia 30363
Telephone: (404) 873-8500
Facsimile: (404) 873-8501          *Attorneys for Defendants*

2

## CERTIFICATE OF SERVICE

I hereby certify that I have this date electronically filed the foregoing **DEFENDANTS' MOTION TO DISMISS OR, ALTERNATIVELY, TO STAY PROCEEDINGS AND COMPEL ARBITRATION** using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Wayne D. Toth
The Toth Law Firm, LLC
400 Galleria parkway
Suite 460
Atlanta, Georgia  30339

This 30th day of April, 2012.

_/s/ Jason E. Bring_____
Jason E. Bring

ARNALL GOLDEN GREGORY LLP
171 17th Street, NW
Suite 2100
Atlanta, Georgia 30363
Telephone: (404) 873-8500
Facsimile: (404) 873-8501

**EXHIBIT A**
**(Admission Agreement)**

14

ADVANT/GE
HEALTH SYSTEMS

## ADMISSION AGREEMENT

Eligibility for Medicaid-sponsored long-term care services is based on income and medical necessity. To qualify for assistance through the Medicaid program, a living center resident must need intermediate or skilled nursing care as determined through an assessment conducted by Medicaid program staff. The fact that a resident has already been admitted to a living center is not considered in this determination. It is possible that a resident could exhaust all other means of paying for living center care and meet Medicaid income criteria but still be denied assistance due to the lack of medical necessity.

It is recommended that all persons seeking admission to a living center be assessed by the Medicaid program prior to admission. This assessment will provide information about the level of care needed and the viability of community services as an alternative to admission.

A resident is not deemed admitted until such time as all agreements required by law have been properly executed. It is the policy of this living center to admit residents only upon written order of the attending physician.

Throughout this Agreement the term a resident I refers to the resident, or where applicable to any person who may, under Georgia law, act on the resident's behalf when the resident is unable to act for himself or herself, or where applicable any person who the resident has delegated decision-making authority. The resident's incapacity or delegation of decision-making authority must be documented in the living center's records in compliance with applicable Georgia statutes. The resident must provide copies of any existing powers of attorney, court orders or ' other applicable documentation prior to admission.

The resident's admission to the living center is subject to the terms and conditions described in this Admission Agreement, the resident's Financial Agreement and applicable living center policies and procedures. The resident shall be admitted only upon execution of all required agreements, completion of a satisfactory physical and social assessment by living center personnel, completion of any required physical examination, and the living center's receipt of a health status certification and an admission order from the resident's attending physician or another physician authorized to admit to the living center.

## <u>SERVICES PROVIDED</u>

1. <u>Room Board/Nursing Care.</u> The living center agrees to furnish room, meals as required by the resident, social services, activities, nursing care, or custodial care, as may be required for the well being of the resident. This provision expressly excludes extraordinary services, including but not limited to private duty nursing and private sitters. In addition, the living center, in conjunction with the resident and the resident's health care providers, will develop and maintain a written plan of care which addresses the resident's medical, nursing, social and dietary needs. This plan of care will be periodically reviewed and revised as necessary, to meet the needs of the resident.

2. <u>Personal Property/Trust Funds.</u> The living center will maintain written records of all financial transactions with the resident. In the event that the resident wishes for the living center to hold personal property in trust, the living center must be given a written inventory, verified by an employee of the Living center, and the property must be held in trust in accordance with the rules and policies of the living center. The resident has a right to have personal funds held on his/her behalf by the living center. The living center will provide the resident with an accounting of all funds held in trust in accordance with all applicable state and federal regulations, whichever are more stringent.

3. <u>Physician Services.</u> Upon execution of this agreement, the living center agrees to admit residents with physician's order or with provisions made therefore, and assist in obtaining the services of a physician if a personal physician becomes unavailable, and obtain emergency physician services when required. In all cases, the physician so retained will bill the resident, Medicare or Medicaid directly, and the living center will not be responsible for payment of the bill for such service. The resident understands and acknowledges that the attending physician is not an employee of the living center and that the living center is neither liable nor responsible for the acts or omissions of the attending physician.

4. <u>Medications.</u> The living center will obtain and administer such medications as may be prescribed, the cost of which shall not be the responsibility of the living center, except under specific circumstances associated with third party payers.

5. <u>Insurance.</u> The living center will assist in application for private insurance benefits and will accept assignment of these benefits. The living center will assist the resident in applying for Medicare or Medicaid benefits where applicable.

6. <u>Transfers.</u> The living center will arrange for prompt transfer of the Resident to a hospital upon physician's orders, or in an emergency situation. Expenses of transfer and care of the resident at the hospital are not: the responsibility of the living center.

7. <u>Linens.</u> The living center will provide bed and bath linens as required for the proper care of the resident, under normal conditions. The resident or someone acting on the resident's behalf shall supply all other personal clothing. In the interest of meeting the needs of all of our residents, the living center requests that the amount of clothing be sufficient.

8. <u>Transmissions.</u> The living center will automatically send computerized assessments and care plans upon admission to the State, your intermediary provider and HCFA. This system will not affect the resident's level of care or payment source.

The living center staff will work with the resident and his/her attending physician to formulate a plan of care for the resident at the time of resident's admission to the living center. This care plan will be updated periodically to take into account the resident's current health status and physical and social needs.

The resident has the right to request a copy of the care plan and to receive explanatory information about the care plan during his/her stay at the living center.

## RESIDENT RESPONSIBILITIES

1. The resident will provide complete personal and medical information to the living center as requested. The resident will provide a medical history, physical examination, current doctor's orders, and doctor's statement that the resident is free from communicable disease on admission of resident or within the required time limitation. If the resident is suffering from a communicable disease, the resident will provide a physician's certificate that the disease is not in a transferable stage, or that adequate or appropriate isolation measures are being carried out to control transmission of the disease. The living center retains the right to refuse admission to any resident suffering from a communicable disease, whether that disease is in a transferable stage or not, so long as said refusal is in compliance with state and federal law. It is the policy of this living center that admission is dependent upon the living center's ability to provide appropriate medical and nursing care. The living center's ability to provide adequate care is the predominate criteria in admitting or not admitting a resident with a known communicable disease or infection. The living center adheres to a policy of making admissions decisions without regard to race, color, sex, national origin, citizenship or age.

2. The resident will permit authorized staff of the living center to perform such nursing and custodial care functions as are necessary to maintain the well being of the resident, including but not limited to assistance with activities of daily living, dressing, performance of restorative nursing care, and performance of therapies as deemed necessary by a physician.

3. The resident agrees to pay all fees and charges described in this Agreement upon the terms agreed to.

4. The resident accepts full responsibility for and absolves and releases the living center, its personnel, Medical Director, management, owners and attending physician from any liability for any event, accident, or deterioration of medical condition while the resident is away from the living center and not under the direct care and supervision of the living center, or if the resident should leave the living center for any reason without first giving notice.

## DISCHARGE

Under Federal law the resident may only be transferred or discharged from this living center for one of the following reasons:

1.    It is necessary for your welfare and your needs cannot be met in this living center.

2.    Your health has improved sufficiently so that you no longer need the services provided by this living center.

3.    The safety of individuals in this living center is endangered.

4.    The health of individuals in this living center would otherwise be endangered.

5.    You have failed, after reasonable and appropriate notice, to pay for (or to have paid under Medicare or Medicaid) a stay at this living center.

6.    The living center ceases to operate.

Any discharge of a resident shall be conducted in accordance with applicable cause, notice, documentation, appeal and other standards set forth in the living center's policies and/or in pertinent state or federal, law. Or regulation.

## FINANCIAL AGREEMEN

The resident authorizes any and all nursing centers; hospitals, physicians and other medical care providers to furnish any medical or financial information to the following organizations at their request:

> The Living center
> Third-Party Payor
> The Social Security Administration Fiscal Intermediaries and carriers Hospitals
> Appropriate State or County Agencies Insurance Companies

## A.    PRIVATE PAY RESIDENTS

1.  Daily Rate. The Living center's current private pay and optional service charges are set out in Attachment A. This daily rate is determined in part by the type of room assigned to the resident and, therefore, may be changed if the resident is transferred to a different room. A charge in the amount of the basic daily rate shall be made f or the day of admission but: not for the day of discharge, except that a late discharge fee on the amount of the agreed basic daily rate may be charged if the resident fails to vacate his room by 12:00 noon on the date of discharge. The resident and the responsible party agree to pay a sum equal to one month in advance, plus ancillaries, if applicable, and thereafter pay for each successive months stay in advance, payable upon receipt of the statement. If the resident is admitted to the living center as a private pay resident and subsequently converts to a Medicaid resident, the living center shall refund any unused advance payment. The living center shall also refund any unused advance payment in the event that the resident leaves the living center prior to the end of the first month.

2.  Extra Services Supplies. The resident shall be responsible for payment of all charges of the living center for supplies or services, which are not included in the living center's daily rate.

3.  Bed Hold. Residents leaving the center for any length of time to any location may elect to hold the bed by paying the daily rate.  In the case of an absent resident whose cost of care is paid f or by the Medicaid Program. Or any other State or Federal program he/she may reserve the bed for The number of days the living center is reimbursed the per diem costs of that Resident's care as if the resident were actually in the living center; however, in No case will the living center reserve the bed for longer than___days at the Per them rate.   Should the reservation days expire under the Medicaid program? The responsible party shall have the option of retaining the bed at private Rates for the length of time deemed necessary by the said parties. The rate of charge is not refundable and should the resident return to the living center and re-qualify for Medicaid, private rates would cease on the date of return to the Medicaid program. There is no refund on bed hold days. **Please note that not all state Medicaid programs** pay for bed holds. THIS **STATE DOES/DOES NOT (Please circle) PAY FOR** BED HOLDS.

B.    MEDICAID RESIDEN

1.  Daily Rate Payment. Services provided under the Medicaid program administered by the State
    and optional service charges are set out in Attachment B. services requested or required by
    the resident and the cost of such services, which are not covered by Medicaid, are also set out
    in Attachment B and are the responsibility of the resident.

2.  Termination of Coverage. The resident may remain in the living center only so long as certified
    eligible for Medicaid payments, or as long as any charges owed by the resident are paid as
    due. Residents who remain beyond the expiration of their Medicaid coverage, or who have
    their coverage retroactively terminated or denied shall be obligated to pay their account as
    private paying residents with rates and charges for services rendered at the regular rates and
    terms in effect at the time of the service.

3.  Resident's Share of Cost. The Medicaid program determines the available monthly income of
    all persons receiving Medicaid assistance and, with respect to most Medicaid beneficiaries,
    requires that out of that income the beneficiary must bear a reasonable share of cost. Payment
    of that share is the responsibility of the resident. The resident's share of cost is subject to
    change as authorized by law or regulation. **The resident and the responsible party agree to
    pay the residents actual or estimated monthly liability amount equal to one month in
    advance.** If the resident fails to make prompt payment of his or her share of cost, where
    appropriate, the living center may require direct mailing of such monies to the living center.
    Such monies will be managed by the living center in accordance with all applicable laws and
    regulatory requirements. The resident ' acknowledges that failure to pay the resident's share of
    cost may constitute grounds for discharge of' the resident for non-payment of the resident's
    stay and the living center will notify the. Appropriate state or federal agency of such
    non-payment.

C.    MEDICARE RESIDENTS

1.  Daily Rate Payment. Services provided for payment made under the Medicare program and
    optional service charges are set out in **Attachment C.** Services and charges for services,
    which are not covered by Medicare, are also set out in **Attachment C** and must be paid f or by
    the resident.

2.  Limited Coverage. The resident understands that Medicare coverage is established by federal
    guidelines and not by the living center. Medicare coverage is limited both as to the level of care
    covered and the duration of coverage. Thus, based upon Medicare criteria, Medicare coverage
    may be terminated prior to the use of all allotted days if the resident ceases to meet such
    criteria.

3.  Expiration of Benefits. At admission any resident who is eligible for Medicare coverage must
    provide documentation that the resident has a method of payment for the services rendered in
    the living center upon the expiration of such coverage. If the resident intends to leave the living
    center upon expiration of Medicare benefits, he/she must advise the living center at the time of
    admission.

if a resident will become Medicaid eligible when Medicare eligibility expires, the resident will be responsible for making a timely and complete application for Medicaid benefits. The living center will assist with the application process when requested to do so. The resident is responsible for periodically checking with the appropriate state agency to seek and receive information on the status of the resident's Medicaid application, or may request that the living center seek and receive such information. The living center will not seek or accept a deposit or other advance payment from residents who convert from Medicare to Medicaid eligibility.

If the resident will convert to private pay status when Medicare eligibility expires, the resident will be required to make a deposit equal to one month of the living center's private pay daily rate, plus one month of applicable optional service charges upon conversion to private pay status.

## RATE ADJUSTMENTS

1. Private Pay Per Diem and Optional Service Charges. The living center may find it necessary, due to inflation or other factors, to increase the private pay daily rate and/or the rate charges for optional services from time to time.

2. Change in Level of Care. The resident's daily rates and optional service charges may be affected by a change in the level of care the resident is receiving at the living center.

3. Changes in Payment Source. Upon the resident's change in payment source (e.g. from Medicare to Medicaid or from Private Pay to Medicare Or Medicaid), the resident's daily rates and optional service charges will be adjusted to account for applicable rates then in effect.

4. Changes in Third Party Payer Requirements. The resident's cost share responsibilities (including co-payments, coinsurance and Deductibles) under the Medicare or Medicaid programs, or under a Private insurance program may vary based upon changes in federal or State laws or regulations, or changes in payer policies.

5. Notice of Rate Changes/Resident's Rights. The living center will notify the resident at least thirty (30) days in advance of any Changes in rates. Private pay residents who object to changes in the private pay daily rate may elect to leave the living center by giving the living center written notice to that effect within the thirty (30) days notice period; provided, however, the rate increase shall apply for those days the resident is in the living center awaiting discharge or transfer beyond the thirty (30) day notice period. Residents who object to changes in optional service charges may elect to terminate their optional service arrangements by giving the living center written notice of their desire during the thirty (30) day Notice period. Residents shall otherwise be deemed to have consented to the rate changes if written notice as described in this section is not provided within the thirty (30) day notice period.

## D.    TIMELY OBLIGATIONS TO PAY

The resident's account for services rendered by the living center shall be billed monthly to the resident.

## E.    DUE DATE

Bills for services rendered to resident by the living center which are not paid upon receipt of the statement shall be past due or delinquent. When payment for services is not made by the fifteenth (15th) day of every billing month, the resident's account may be assessed a delinquency charge at the monthly rate of one and one-half percent (1-1/2%) (Or the maximum amount permitted by law, whichever is greater) of the outstanding balance.

The resident acknowledges    t the delinquency charge does no   lter any obligations of either the living center or the resident or his or her responsible party or agent under this agreement.

The resident and/or responsible party or agent acknowledge that the living center does not grant credit or allow installment payments, and the living center's acceptance of partial payment shall not limit the living center's right under this agreement.

**F.    FAILURE TO PAY**

If the resident fails to make a payment required hereunder when same becomes due and payable, and this delinquency continues for a period of fifteen (15) days from the due date, the living center may discharge the resident in accordance with applicable cause, notice, documentation, appeal and other standards set forth in the living center's policies and/or in pertinent state or federal law or regulation. The resident shall be responsible for all relocation expenses, in addition to all charges due to the living center for care received prior to his/her discharge. Nothing in this section shall be construed to limit the living center's rights to file an action at law or in equity to collect the balance due and owing to the living center.

**G.    INSURANCE COVERAGE**

Where the resident's care at the living center is covered by insurance or some other third party payor coverage, the resident shall nonetheless be primarily responsible for making payments pursuant to this agreement regardless of such third party payer coverage, and shall be responsible for paying all charges not paid by any third party payer including any coinsurance or deductible amounts required by any third party payer, according to the living center's payment schedule.

**H.    FEE FOR RETURNED CHECKS**

A service fee of twenty-five dollars ($25.00) will be charged for any returned check.

## REFUND POLICY

The refund of the unused portion of prepaid fees and charges will be made within approximately six to eight weeks following discharge. In the event of resident's death, refunds will be made in accordance with state and federal law. Any personal property belonging to the resident in the living center at the time of the resident's discharge from the living center will be released in accordance with the state and federal law.

# PROTECTION OF RESIDENT'S PERSONAL FUNDS

This living center has a policy of complying with state and federal rules and regulations as it relates to protection of a resident's personal funds. As a resident you are not required to deposit your personal funds with the living center. However, upon your request, we will hold, safeguard, manage and account for your personal funds as they are deposited with the living center. All funds deposited in the living center will be placed in an interest bearing account that is separate from the living center's operating account. On a monthly basis, the interest earned will be credited to your account.

If you are a Medicaid resident, we will notify you when the amount in your account reaches $200.00 less than the Medicaid resource limit for one person, and if it appears that you may lose your eligibility for Medicaid. Of course, we cannot notify you of information of which we have no knowledge.

Upon the death of a resident, this living center will promptly convey, within approximately six to eight weeks, the resident's funds and a final accounting of those funds to the individual or probate jurisdiction administering the resident I s estate. This living center maintains a surety bond to assure the security of your personal funds. If the resident- had a resident trust fund at the living center, a final accounting and final disbursement of funds will occur within 30 days of discharge.

I, «Residents Name» do hereby request that my Personal funds be held, safeguarded, managed and accounted for by this Living center.

I, «Responsible Party» responsible party for «Residents Name» A resident, and do hereby Request that his/her personal funds be held, safeguarded, managed and Accounted for by this living center.

_____          _____
Signature of Resident or Legal Representative          Date

Identity of the individual authorized to accept funds upon my discharge from the living center:

NAME:_____          PHONE: _____

ADDRESS:_____

RESIDENT:_____          DATE:_____

## BILL OF RIGHTS

I acknowledge that I have received a copy of the Bill of Rights for Residents of Long Term Care Facilities and have had this information-Explained to me by a member of the living center's staff.

Signature of Resident _Shewson O Hogsett_        Date _3-11-10_

## RESIDENT'S PERSONAL PROPERTY

Upon admission, an inventory of items entrusted to the living center for safekeeping will be compiled. At the time of discharge or death, these items will be distributed to the resident, legal representative or responsible party. All personal items must be recovered from the living center within 30 days from the date of discharge or death. If the items are not recovered within 30 days, the living center reserves the right to dispose of all personal belongings as it sees fit. **This living center does not accept responsibility for personal belongings, which** the resident elects to keep in their own possession.

## CONSENTS AND RELEASES

**AUTHORIZATION FOR TREATMENT:**
The resident hereby authorizes the professional staff of the living center to administer necessary nursing procedures, podiatric procedures, skin scrapings, non surgical dental procedures, and laboratory and x-ray procedures on the resident while the resident is in the living center. This consent may be withdrawn at any time. The resident understands that an additional consent will be needed for any surgical treatment, or for any treatment requiring the use of general anesthesia.

The resident has read, and has had fully explained to him/her, and fully understands the above Authorization for Treatment. No guarantee or assurance has been made concerning the results that may be obtained.

**ACTIVITY RELEASE:**
I hereby **DO/DO NOT** (Please Circle) authorize **«Residents Name»** to participate in planned recreational activities, in accordance with Physician's orders, both on and off the living center premises. I understand that each resident is encouraged, but not forced to participate. Furthermore, I accept complete responsibility for the above named residents while away from the living center, and absolve the management of said living center, its personnel, and the attending physician of responsibility.

**PHOTOGRAPHY RELEASE:**
I hereby **DO/DO NOT** (Please Circle) authorize the living center, staff, or those requested by the staff to photograph and use said photographs, negatives or prints as may be deemed necessary for identification purposes, activities and, if the need arises, for medical purposes.

**LAUNDRY CONSENT:**
I hereby **DO/DO NOT** (Please Circle) authorize the living center to maintain the personal laundry for **«Residents Name»**. All personal laundry items will be laundered by the living center at the rate of $___0___ per month. The living center will not accept responsibility for loss or damage. The living center reserves the right to increase its charge with proper notice to the resident or responsible party.

**PHYSICIAN CONSENT AND IDENTIFICATION OF HOW TO CONTACT** Form 04/30/12   Page 12 of 12

It is the policy of this living center to encourage use of one's own personal physician as long as the physician is licensed in the appropriate state and agrees to comply with the rules and regulations of this living center and appropriate state agencies. If a resident does not have a personal physician, one will be appointed by the living center.

Your physician is: _Abraham_ _____

Address: _____

Phone Number: _____

## SELF-ADMINISTRATION OF MEDICATION:

It is the policy of this living center that the resident has the right to self administer his or her own medication if the interdisciplinary team has determined that this practice is safe. The following criteria must be met:

1. Physician's orders for administration of medication must be on file at the living center (may be all or a specific drug).
2. The resident has signed a document stating his/her desire to self medicate.
3. The level of ability to identify medication, dosage, time and to store properly has been determined as safe by the interdisciplinary team.
4. A safe storage place, plan for documentation and a method of accountability has been established.
5. If at any time the interdisciplinary team determines the practice is unsafe, the resident and physician will be notified.

As stated above, every resident has the right to self-administer their medications as long as this practice does not pose a danger to the resident or to other residents of the living center.

## RESTRAINT POLICY:

I do hereby acknowledge that **«Residents Name»** has the right to be free from any physical or chemical restraints administered for the purpose of discipline or convenience and not required to treat the resident's medical symptoms.

It is the policy of this living center that all residents remain restraint free, unless indicated in writing by the attending physician that specifies the duration and the circumstances under which the restraints are to be used.

## AUTHORIZATION FOR PAYMENT AND RELEASE OF INFORMATION

I hereby authorize the living center to utilize the Part B programs and or suppliers of their choice. Additionally, I authorize the living center to bill Medicare, Medicaid, and any other insurance carrier with whom I may have coverage. I request that payment of authorized insurance benefits be made directly to the supplier with whom the living center is contracted. I authorize any holder of medical information about its agents, the living center's supplier, and me to release to the insurance company involved any information needed to determine these benefits for related services.

Signature _Sharon O'Dogsett_          Date _3-11-10_

Witness _M. Vaishrlos_ _____

Note: If the resident is unable to sign, complete authorizing signature Section below.

Authorized Signature and Relationship _dtr_          Date _____

Reason Resident Could Not Sign: _not present_

## EXHIBIT B
### (Arbitration Agreement)

# HMR/Advantage Health Systems, Inc.

## Parkwood Living Center

## AGREEMENT TO ARBITRATE

To avoid undue expense, delay, and uncertainty in the prosecution of a civil action, the parties to this Agreement to Arbitrate agree to submit the issues outlined herein to binding arbitration in accordance with the United States Arbitration Act, 9 U.S.C. §§ 1 to 207 ("Federal Arbitration Act"). Any civil action, the subject matter of which is encompassed by this Agreement to Arbitrate, shall be stayed pending any award issued pursuant to this Agreement to Arbitrate. This Agreement to Arbitration shall be governed by and interpreted under the Federal Arbitration Act. The Living Center includes the particular facility where the Resident resides, its parents, affiliates, owners, officers, agents, and employees (collectively, the "Living Center").

**CLAIMS SUBJECT TO ARBITRATION**: Any and all claims or controversies arising out of or in any way relating to the Resident's stay at the Living Center including the care and treatment received by the Resident at the Living Center shall be submitted to binding arbitration pursuant to the Federal Arbitration Act. This right to demand arbitration includes, without limitation, disputes regarding interpretation of this Agreement, disputes arising under state or federal law, either currently existing or arising in the future, including claims for statutory, compensatory, or punitive damages and claims based on breach of contract, tort, negligence, or breach of statutory duties.

**SELECTION OF ARBITRATOR**: The parties shall agree upon an arbitrator. If the parties cannot reach an agreement regarding the choice of an arbitrator within twenty (20) days of submission of the arbitration demand, the parties shall request from the American Health Lawyers Association a list of five potential arbitrators from which one will be selected. Either party may elect that the matter be heard by three (3) arbitrators, all to be chosen by the above method.

**APPLICABLE LAW**: Subject to the limitations herein and to the extent applicable, the arbitration shall be conducted in accordance with the Georgia Rules of Civil Procedure, the Georgia Rules of Evidence, and the American Health Lawyers Association Rules for Arbitration. Any dispute concerning the applicable law shall be resolved by the arbitrator(s).

**DISCOVERY**: Notwithstanding the provisions above, each party shall be allowed to depose a maximum of three (3) non-expert witnesses. Each party is limited to two (2) expert witnesses and depositions shall be limited to four (4) hours per expert and/or witness. No later than fourteen (14) working days before the arbitration hearing, the parties shall exchange a list of witnesses, a list of exhibits, and any sworn statements to be relied upon at the arbitration.

**LOCATION**: All arbitration hearings shall be held at a place designated by the arbitrator(s) in the county in which the Living Center is located or at a location mutually agreed upon by the parties.

**COSTS**: The fees of the Arbitrator shall be shared equally by the parties. Each party shall bear its own attorneys' fees and costs unless otherwise set forth in the arbitration award.

The Resident and the Living Center expressly agree and voluntarily enter into this binding Agreement to Arbitrate. By my signature below I affirm that I understand that I am voluntarily signing this Agreement to Arbitrate. I further affirm that I understand that not signing this Agreement will have no effect on the admission process or care and treatment provided by the Living Center.

**THIS AGREEMENT TO ARBITRATE CONSTITUTES
A WAIVER OF THE RIGHT TO A TRIAL BY JURY.**

**I AGREE TO THE TERMS OF THIS AGREEMENT TO ARBITRATE.**

*Patricia Joyner*
Name of Resident—Please Print

_____          _____
Signature of Resident                                              Date

*Shervon Hogsett*
Name of Legal Representative/Caretaker—Please Print

X *Shervon J. Hogsett*                                  *3-11-10*
Signature of Legal Representative/Caretaker        Date

*Cara Naisnilos*
Name of Living Center Representative—Please Print

*C Naisnilos*                                                  *3/11/10*
Signature of Living Center Representative          Date

2                                                                              Rev. 4/09

<u>**EXHIBIT E**</u>
**(Declaration of Michael H. McBride)**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SHERVON HOGSETT, Individually,
and as Administratrix of the Estate of
Patricia Joyner, deceased, and GARY
JOYNER, Individually,

        Plaintiffs,

v.

Parkwood Nursing & Rehabilitation
Center, Inc., Parkwood Living Center,
LLC, HMR Advantage Health Systems,
Inc., Scepter Health & Rehab of
Snellville, LLC, Covenant Dove, Inc.,
Covenant Dove, LLC, Covenant Dove
Holding Company, LLC, Ark Holding
Company, Inc., and Ark Holdings, LLC.

        Defendants.

CASE NO. 1:12-cv-01399-JEC

### DECLARATION OF MICHAEL H. MCBRIDE

    1.    My name is Michael H. McBride. I am over twenty-one years of age.

I make the statements in this declaration based on my personal knowledge.

    2.    I was the Corporate Executive Officer of HMR Advantage Health

Systems, Inc. during Ms. Patricia Joyner's residency at Parkwood Living Center,

LLC ("Parkwood") from March 11, 2010 until March 24, 2010. At that time,

HMR Advantage Health Systems, Inc. provided administrative support services to

Parkwood.

4714979v1

3.    During the time of the events forming the basis of the Complaint in this action, it was Parkwood's policy to provide nursing services to residents from other states.

4.    During the time of the events forming the basis of the Complaint in this action, Parkwood participated in and received reimbursement under the Medicare and Medicaid programs.

5.    During the time of the events forming the basis of the Complaint in this action, it was Parkwood's policy to accept insurance payments from out of state insurance companies.

Executed on April 27, 2012.

Michael H. McBride

4714979v1                              - 2 -

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Shervon Hogsett, Individually, and as
Administratrix of the Estate of Patricia
Joyner, deceased, and Gary Joyner,
Individually,
Plaintiffs,

vs.

CIVIL ACTION FILE NO.:
1:12-cv-01399-JEC

Parkwood Nursing and Rehabilitation
Center, Inc., Parkwood Living Center,
LLC, HMR Advantage Health
Systems, Inc., Scepter Health & Rehab of
Snellville, LLC, Covenant Dove, Inc.,
Covenant Dove, LLC, Covenant Dove
Holding Company, LLC, Ark Holding
Company, Inc., and Ark Holdings, LLC,

**Plaintiffs' Ex. "1"**

Defendants.

## DECLARATION OF SHERVON HOGSETT

1.

I am of sound mind, over eighteen (18) years of age, and fully competent to
testify to the matters stated herein.  I make this declaration based upon my own
personal knowledge.

2.

I am the daughter of Patricia Joyner.

3.

I assisted with my mother's admissions to Parkwood Nursing and Rehabilitation Center/Parkwood Living Center (hereinafter "Parkwood"). As part of my assistance, I signed the documents entitled "Agreement to Arbitrate," and "Admission Agreement," which are attached to this affidavit as Exhibits "A" and "B," respectively. Although I signed these documents, prior to signing them, I had never been granted nor had a Power of Attorney for Patricia Joyner, nor had I ever been appointed as guardian or conservator of Patricia Joyner.

4.

To the best of my knowledge, no person had ever been appointed as guardian or conservator of Patricia Joyner. I have never been attorney-in-fact for Patricia Joyner. I have never held myself out as being attorney-in-fact for Patricia Joyner or holder of a Power of Attorney of Patricia Joyner, nor have I ever held myself out as guardian or conservator of Patricia Joyner.

5.

On March 11, 2010, I accompanied my mother when she was admitted into Parkwood. I was given a large stack of admission documents to sign, and signed them. At no time did any employee of HMR/Advantage Health Systems, Inc, Parkwood Living Center, LLC, or Parkwood Nursing and Rehabilitation Center, Inc. ever explain the Agreement to Arbitrate with me, or ask me if I had any authority to sign it or any other documents on behalf of Patricia Joyner.

6.

I have never sought, and I have never had, a power of attorney for my mother, Patricia Joyner.

7.

I have never sought to be appointed, and I have never been appointed, as the guardian or conservator for my mother, Patricia Joyner.

8.

I have never sought, and I have never had, authority pursuant to a Georgia Advance Health Care Directive to make any medical decisions on behalf of my mother, Patricia Joyner.

9.

I have never sought, and I have never had, any express or implied permission to enter into an arbitration agreement on behalf of my mother, Patricia Joyner.

10.

If I had understood that the Arbitration Agreement I signed on March 11, 2010, meant that that we could not pursue a lawsuit in a court of law if my mother were mistreated or injured by Parkwood and the people who worked there, I would not have signed the documents.

11.

Patricia Joyner never gave me express permission to sign any documents related

to her admission to Parkwood.

12.

I did not discuss any of the documents I signed on March 11, 2010, with Patricia Joyner, including the Arbitration Agreement, before or after I signed them.

13.

Patricia Joyner was not present at the time that I signed the documents, including the Arbitration Agreement, on March 11, 2010.

14.

Patricia Joyner did not know that I had signed any of the documents, including the Arbitration Agreement, on March 11, 2010.

15.

Patricia Joyner made no decisions about whether she should be admitted to Parkwood or whether she should remain there.

16.

In accordance with 28 USC § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May _11_, 2012.

Shervon Hogsett

4

# HMR/Advantage Health Systems, Inc.

# Parkwood Living Center

# AGREEMENT TO ARBITRATE

To avoid undue expense, delay, and uncertainty in the prosecution of a civil action, the parties to this Agreement to Arbitrate agree to submit the issues outlined herein to binding arbitration in accordance with the United States Arbitration Act, 9 U.S.C. §§ 1 to 207 ("Federal Arbitration Act"). Any civil action, the subject matter of which is encompassed by this Agreement to Arbitrate, shall be stayed pending any award issued pursuant to this Agreement to Arbitrate. This Agreement to Arbitration shall be governed by and interpreted under the Federal Arbitration Act. The Living Center includes the particular facility where the Resident resides, its parents, affiliates, owners, officers, agents, and employees (collectively, the "Living Center").

**CLAIMS SUBJECT TO ARBITRATION:** Any and all claims or controversies arising out of or in any way relating to the Resident's stay at the Living Center including the care and treatment received by the Resident at the Living Center shall be submitted to binding arbitration pursuant to the Federal Arbitration Act. This right to demand arbitration includes, without limitation, disputes regarding interpretation of this Agreement, disputes arising under state or federal law, either currently existing or arising in the future, including claims for statutory, compensatory, or punitive damages and claims based on breach of contract, tort, negligence, or breach of statutory duties.

**SELECTION OF ARBITRATOR:** The parties shall agree upon an arbitrator. If the parties cannot reach an agreement regarding the choice of an arbitrator within twenty (20) days of submission of the arbitration demand, the parties shall request from the American Health Lawyers Association a list of five potential arbitrators from which one will be selected. Either party may elect that the matter be heard by three (3) arbitrators, all to be chosen by the above method.

**APPLICABLE LAW:** Subject to the limitations herein and to the extent applicable, the arbitration shall be conducted in accordance with the Georgia Rules of Civil Procedure, the Georgia Rules of Evidence, and the American Health Lawyers Association Rules for Arbitration. Any dispute concerning the applicable law shall be resolved by the arbitrator(s).

**DISCOVERY:** Notwithstanding the provisions above, each party shall be allowed to depose a maximum of three (3) non-expert witnesses. Each party is limited to two (2) expert witnesses and depositions shall be limited to four (4) hours per expert and/or witness. No later than fourteen (14) working days before the arbitration hearing, the parties shall exchange a list of witnesses, a list of exhibits, and any sworn statements to be relied upon at the arbitration.

**LOCATION:** All arbitration hearings shall be held at a place designated by the arbitrator(s) in the county in which the Living Center is located or at a location mutually agreed upon by the parties.

**COSTS:** The fees of the Arbitrator shall be shared equally by the parties. Each party shall bear its own attorneys' fees and costs unless otherwise set forth in the arbitration award.

GA

Rev. 4/09

The Resident and the Living Center expressly agree and voluntarily enter into this binding Agreement to Arbitrate.  By my signature below I affirm that I understand that I am voluntarily signing this Agreement to Arbitrate.  I further affirm that I understand that not signing this Agreement will have no effect on the admission process or care and treatment provided by the Living Center.

**THIS AGREEMENT TO ARBITRATE CONSTITUTES
A WAIVER OF THE RIGHT TO A TRIAL BY JURY.**

**I AGREE TO THE TERMS OF THIS AGREEMENT TO ARBITRATE.**

*Patricia Joyner*
Name of Resident—Please Print

_____          _____
Signature of Resident                                      Date

*Shervon Hogsett*
Name of Legal Representative/Caretaker—Please Print

*X Shervon J. Hogsett*                     *3-11-10*
Signature of Legal Representative/Caretaker          Date

*Cara Waisnilos*
Name of Living Center Representative—Please Print

*CWaisnilos*                               *3/11/10*
Signature of Living Center Representative             Date

2

Rev. 4/09

## EXHIBIT A
**(Admission Agreement)**

ADVANT/GE
HEALTH SYSTEMS

## ADMISSION AGREEMENT

Eligibility for Medicaid-sponsored long-term care services is based on income and medical necessity. To qualify for assistance through the Medicaid program, a living center resident must need intermediate or skilled nursing care as determined through an assessment conducted by Medicaid program staff. The fact that a resident has already been admitted to a living center is not considered in this determination. It is possible that a resident could exhaust all other means of paying for living center care and meet Medicaid income criteria but still be denied assistance due to the lack of medical necessity.

It is recommended that all persons seeking admission to a living center be assessed by the Medicaid program prior to admission. This assessment will provide information about the level of care needed and the viability of community services as an alternative to admission.

A resident is not deemed admitted until such time as all agreements required by law have been properly executed. It is the policy of this living center to admit residents only upon written order of the attending physician.

Throughout this Agreement the term a resident I refers to the resident, or where applicable to any person who may, under Georgia law, act on the resident's behalf when the resident is unable to act for himself or herself, or where applicable any person who the resident has delegated decision-making authority. The resident's incapacity or delegation of decision-making authority must be documented in the living center's records in compliance with applicable Georgia statutes. The resident must provide copies of any existing powers of attorney, court orders or ' other applicable documentation prior to admission.

The resident's admission to the living center is subject to the terms and conditions described in this Admission Agreement, the resident's Financial Agreement and applicable living center policies and procedures. The resident shall be admitted only upon execution of all required agreements, completion of a satisfactory physical and social assessment by living center personnel, completion of any required physical examination, and the living center's receipt of a health status certification and an admission order from the resident's attending physician or another physician authorized to admit to the living center.

## SERVICES PROVIDED

**1. Room Board/Nursing Care.** The living center agrees to furnish room, meals as required by the resident, social services, activities, nursing care, or custodial care, as may be required for the well being of the resident. This provision expressly excludes extraordinary services, including but not limited to private duty nursing and private sitters. In addition, the living center, in conjunction with the resident and the resident's health care providers, will develop and maintain a written plan of care which addresses the resident's medical, nursing, social and dietary needs. This plan of care will be periodically reviewed and revised as necessary, to meet the needs of the resident.

**2. Personal Property/Trust Funds.** The living center will maintain written records of all financial transactions with the resident. In the event that the resident wishes for the living center to hold personal property in trust, the living center must be given a written inventory, verified by an employee of the Living center, and the property must be held in trust in accordance with the rules and policies of the living center. The resident has a right to have personal funds held on his/her behalf by the living center. The living center will provide the resident with an accounting of all funds held in trust in accordance with all applicable state and federal regulations, whichever are more stringent.

**3. Physician Services.** Upon execution of this agreement, the living center agrees to admit residents with physician's order or with provisions made therefore, and assist in obtaining the services of a physician if a personal physician becomes unavailable, and obtain emergency physician services when required. In all cases, the physician so retained will bill the resident, Medicare or Medicaid directly, and the living center will not be responsible for payment of the bill for such service. The resident understands and acknowledges that the attending physician is not an employee of the living center and that the living center is neither liable nor responsible for the acts or omissions of the attending physician.

**4. Medications.** The living center will obtain and administer such medications as may be prescribed, the cost of which shall not be the responsibility of the living center, except under specific circumstances associated with third party payers.

**5. Insurance.** The living center will assist in application for private insurance benefits and will accept assignment of these benefits. The living center will assist the resident in applying for Medicare or Medicaid benefits where applicable.

**6. Transfers.** The living center will arrange for prompt transfer of the Resident to a hospital upon physician's orders, or in an emergency situation. Expenses of transfer and care of the resident at the hospital are not the responsibility of the living center.

**7. Linens.** The living center will provide bed and bath linens as required for the proper care of the resident, under normal conditions. The resident or someone acting on the resident's behalf shall supply all other personal clothing. In the interest of meeting the needs of all of our residents, the living center requests that the amount of clothing be sufficient.

**8. Transmissions.** The living center will automatically send computerized assessments and care plans upon admission to the State, your intermediary provider and HCFA. This system will not affect the resident's level of care or payment source.

The living center staff will work with the resident and his/her attending physician to formulate a plan of care for the resident at the time of resident's admission to the living center. This care plan will be updated periodically to take into account the resident's current health status and physical and social needs.

The resident has the right to request a copy of the care plan and to receive explanatory information about the care plan during his/her stay at the living center.

## RESIDENT RESPONSIBILITIES

1. The resident will provide complete personal and medical information to the living center as requested. The resident will provide a medical history, physical examination, current doctor's orders, and doctor's statement that the resident is free from communicable disease on admission of resident or within the required time limitation. If the resident is suffering from a communicable disease, the resident will provide a physician's certificate that the disease is not in a transferable stage, or that adequate or appropriate isolation measures are being carried out to control transmission of the disease. The living center retains the right to refuse admission to any resident suffering from a communicable disease, whether that disease is in a transferable stage or not, so long as said refusal is in compliance with state and federal law. It is the policy of this living center that admission is dependent upon the living center's ability to provide appropriate medical and nursing care. The living center's ability to provide adequate care is the predominate criteria in admitting or not admitting a resident with a known communicable disease or infection. The living center adheres to a policy of making admissions decisions without regard to race, color, sex, national origin, citizenship or age.

2. The resident will permit authorized staff of the living center to perform such nursing and custodial care functions as are necessary to maintain the well being of the resident, including but not limited to assistance with activities of daily living, dressing, performance of restorative nursing care, and performance of therapies as deemed necessary by a physician.

3. The resident agrees to pay all fees and charges described in this Agreement upon the terms agreed to.

4. The resident accepts full responsibility for and absolves and releases the living center, its personnel, Medical Director, management, owners and attending physician from any liability for any event, accident, or deterioration of medical condition while the resident is away from the living center and not under the direct care and supervision of the living center, or if the resident should leave the living center for any reason without first giving notice.

## DISCHARGE

Under Federal law the resident may only be transferred or discharged from this living center for one of the following reasons:

1. It is necessary for your welfare and your needs cannot be met in this living center.

2. Your health has improved sufficiently so that you no longer need the services provided by this living center.

3. The safety of individuals in this living center is endangered.

4. The health of individuals in this living center would otherwise be endangered.

5. You have failed, after reasonable and appropriate notice, to pay for (or to have paid under Medicare or Medicaid) a stay at this living center.

6. The living center ceases to operate.

Any discharge of a resident shall be conducted in accordance with applicable cause, notice, documentation, appeal and other standards set forth in the living center's policies and/or in pertinent state or federal, law. Or regulation.

# FINANCIAL AGREEMENT

The resident authorizes any and all nursing centers; hospitals, physicians and other medical care providers to furnish any medical or financial information to the following organizations at their request:

The Living center
Third-Party Payor
The Social Security Administration Fiscal Intermediaries and carriers Hospitals
Appropriate State or County Agencies Insurance Companies

## A.    PRIVATE PAY RESIDENTS

1.  Daily Rate. The Living center's current private pay and optional service charges are set out in Attachment A. This daily rate is determined in part by the type of room assigned to the resident and, therefore, may be changed if the resident is transferred to a different room. A charge in the amount of the basic daily rate shall be made f or the day of admission but: not for the day of discharge, except that a late discharge fee on the amount of the agreed basic daily rate may be charged if the resident fails to vacate his room by 12:00 noon on the date of discharge. The resident and the responsible party agree to pay a sum equal to one month in advance, plus ancillaries, if applicable, and thereafter pay for each successive months stay in advance, payable upon receipt of the statement. If the resident is admitted to the living center as a private pay resident and subsequently converts to a Medicaid resident, the living center shall refund any unused advance payment. The living center shall also refund any unused advance payment in the event that the resident leaves the living center prior to the end of the first month.

2.  Extra Services Supplies. The resident shall be responsible for payment of all charges of the living center for supplies or services, which are not included in the living center's daily rate.

3.  Bed Hold. Residents leaving the center for any length of time to any location may elect to hold the bed by paying the daily rate. In the case of an absent resident whose cost of care is paid f or by the Medicaid Program. Or any other State or Federal program he/she may reserve the bed for The number of days the living center is reimbursed the per diem costs of that Resident's care as if the resident were actually in the living center; however, in No case will the living center reserve the bed for longer than___days at the Per them rate.   Should the reservation days expire under the Medicaid program? The responsible party shall have the option of retaining the bed at private Rates for the length of time deemed necessary by the said parties. The rate of charge is not refundable and should the resident return to the living center and re-qualify for Medicaid, private rates would cease on the date of return to the Medicaid program. There is no refund on bed hold days. **Please note that not all state Medicaid programs** pay for bed holds. THIS **STATE DOES/DOES NOT (Please circle) PAY FOR BED** HOLDS.

B.   **MEDICAID RESIDEN**

1.   Daily Rate Payment. Services provided under the Medicaid program administered by the State and optional service charges are set out in Attachment B. services requested or required by the resident and the cost of such services, which are not covered by Medicaid, are also set out in **Attachment B** and are the responsibility of the resident.

2.   Termination of Coverage. The resident may remain in the living center only so long as certified eligible for Medicaid payments, or as long as any charges owed by the resident are paid as due. Residents who remain beyond the expiration of their Medicaid coverage, or who have their coverage retroactively terminated or denied shall be obligated to pay their account as private paying residents with rates and charges for services rendered at the regular rates and terms in effect at the time of the service.

3.   Resident's Share of Cost. The Medicaid program determines the available monthly income of all persons receiving Medicaid assistance and, with respect to most Medicaid beneficiaries, requires that out of that income the beneficiary must bear a reasonable share of cost. Payment of that share is the responsibility of the resident. The resident's share of cost is subject to change as authorized by law or regulation. **The resident and the responsible party agree to pay the residents actual or estimated monthly liability amount equal to one month in advance.** If the resident fails to make prompt payment of his or her share of cost, where appropriate, the living center may require direct mailing of such monies to the living center. Such monies will be managed by the living center in accordance with all applicable laws and regulatory requirements. The resident ' acknowledges that failure to pay the resident's share of cost may constitute grounds for discharge of the resident for non-payment of the resident's stay and the living center will notify the. Appropriate state or federal agency of such non-payment.

C.   **MEDICARE RESIDENTS**

1.   Daily Rate Payment. Services provided for payment made under the Medicare program and optional service charges are set out in **Attachment C.** Services and charges for services, which are not covered by Medicare, are also set out in **Attachment C** and must be paid f or by the resident.

2.   Limited Coverage. The resident understands that Medicare coverage is established by federal guidelines and not by the living center. Medicare coverage is limited both as to the level of care covered and the duration of coverage. Thus, based upon Medicare criteria, Medicare coverage may be terminated prior to the use of all allotted days if the resident ceases to meet such criteria.

3.   Expiration of Benefits. At admission any resident who is eligible for Medicare coverage must provide documentation that the resident has a method of payment for the services rendered in the living center upon the expiration of such coverage. If the resident intends to leave the living center upon expiration of Medicare benefits, he/she must advise the living center at the time of admission.

If a resident will become Medicaid eligible when Medicare eligibility expires, the resident will be responsible for making a timely and complete application for Medicaid benefits. The living center will assist with the application process when requested to do so. The resident is responsible for periodically checking with the appropriate state agency to seek and receive information on the status of the resident's Medicaid application, or may request that the living center seek and receive such information. The living center will not seek or accept a deposit or other advance payment from residents who convert from Medicare to Medicaid eligibility.

If the resident will convert to private pay status when Medicare eligibility expires, the resident will be required to make a deposit equal to one month of the living center's private pay daily rate, plus one month of applicable optional service charges upon conversion to private pay status.

## RATE ADJUSTMENTS

1. <u>Private Pay Per Diem and Optional Service Charges.</u> The living center may find it necessary, due to inflation or other factors, to increase the private pay daily rate and/or the rate charges for optional services from time to time.

2. <u>Change in Level of Care.</u> The resident's daily rates and optional service charges may be affected by a change in the level of care the resident is receiving at the living center.

3. <u>Changes in Payment Source.</u> Upon the resident's change in payment source (e.g. from Medicare to Medicaid or from Private Pay to Medicare Or Medicaid), the resident's daily rates and optional service charges will be adjusted to account for applicable rates then in effect.

4. <u>Changes in Third Party Payer Requirements.</u> The resident's cost share responsibilities (including co-payments, coinsurance and Deductibles) under the Medicare or Medicaid programs, or under a Private insurance program may vary based upon changes in federal or State laws or regulations, or changes in payer policies.

5. <u>Notice of Rate Changes/Resident's Rights.</u> The living center will notify the resident at least thirty (30) days in advance of any Changes in rates. Private pay residents who object to changes in the private pay daily rate may elect to leave the living center by giving the living center written notice to that effect within the thirty (30) days notice period; provided, however, the rate increase shall apply for those days the resident is in the living center awaiting discharge or transfer beyond the thirty (30) day notice period. Residents who object to changes in optional service charges may elect to terminate their optional service arrangements by giving the living center written notice of their desire during the thirty (30) day Notice period. Residents shall otherwise be deemed to have consented to the rate changes if written notice as described in this section is not provided within the thirty (30) day notice period.

## D.    TIMELY OBLIGATIONS TO PAY

The resident's account for services rendered by the living center shall be billed monthly to the resident.

## E.    DUE DATE

Bills for services rendered to resident by the living center which are not paid upon receipt of the statement shall be past due or delinquent. When payment for services is not made by the fifteenth (15th) day of every billing month, the resident's account may be assessed a delinquency charge at the monthly rate of one and one-half percent (1-1/2%) (Or the maximum amount permitted by law, whichever is greater) of the outstanding balance.

The resident acknowledges       t the delinquency charge does nc   lter any obligations of either the living center or the resident or his or her responsible party or agent under this agreement.

The resident and/or responsible party or agent acknowledge that the living center does not grant credit or allow installment payments, and the living center's acceptance of partial payment shall not limit the living center's right under this agreement.

## F.    FAILURE TO PAY

If the resident fails to make a payment required hereunder when same becomes due and payable, and this delinquency continues for a period of fifteen (15) days from the due date, the living center may discharge the resident in accordance with applicable cause, notice, documentation, appeal and other standards set forth in the living center's policies and/or in pertinent state or federal law or regulation. The resident shall be responsible for all relocation expenses, in addition to all charges due to the living center for care received prior to his/her discharge. Nothing in this section shall be construed to limit the living center's rights to file an action at law or in equity to collect the balance due and owing to the living center.

## G.    INSURANCE COVERAGE

Where the resident's care at the living center is covered by insurance or some other third party payor coverage, the resident shall nonetheless be primarily responsible for making payments pursuant to this agreement regardless of such third party payer coverage, and shall be responsible for paying all charges not paid by any third party payer including any coinsurance or deductible amounts required by any third party payer, according to the living center's payment schedule.

## H.    FEE FOR RETURNED CHECKS

A service fee of twenty-five dollars ($25.00) will be charged for any returned check.

## REFUND POLICY

The refund of the unused portion of prepaid fees and charges will be made within approximately six to eight weeks following discharge. In the event of resident's death, refunds will be made in accordance with state and federal law. Any personal property belonging to the resident in the living center at the time of the resident's discharge from the living center will be released in accordance with the state and federal law.

# PROTECTION OF RESIDENT'S PERSONAL FUNDS

This living center has a policy of complying with state and federal rules and regulations as it relates to protection of a resident's personal funds. As a resident you are not required to deposit your personal funds with the living center. However, upon your request, we will hold, safeguard, manage and account for your personal funds as they are deposited with the living center. All funds deposited in the living center will be placed in an interest bearing account that is separate from the living center's operating account. On a monthly basis, the interest earned will be credited to your account.

If you are a Medicaid resident, we will notify you when the amount in your account reaches $200.00 less than the Medicaid resource limit for one person, and if it appears that you may lose your eligibility for Medicaid. Of course, we cannot notify you of information of which we have no knowledge.

Upon the death of a resident, this living center will promptly convey, within approximately six to eight weeks, the resident's funds and a final accounting of those funds to the individual or probate jurisdiction administering the resident I s estate. This living center maintains a surety bond to assure the security of your personal funds. If the resident- had a resident trust fund at the living center, a final accounting and final disbursement of funds will occur within 30 days of discharge.

I, «Residents Name» do hereby request that my Personal funds be held, safeguarded, managed and accounted for by this Living center.

I, «Responsible Party» responsible party for «Residents Name» A resident, and do hereby Request that his/her personal funds be held, safeguarded, managed and Accounted for by this living center.

_____          _____
Signature of Resident or Legal Representative          Date

Identity of the individual authorized to accept funds upon my discharge from the living center:

NAME:_____ PHONE: _____

ADDRESS:_____

RESIDENT:_____ DATE:_____

I acknowledge that I have received a copy of the Bill of Rights for Residents of Long Term Care Facilities and have had this information-Explained to me by a member of the living center's staff.

Signature of Resident _Sharron Hogsett_ Date _3-11-10_

## RESIDENT'S PERSONAL PROPERTY

Upon admission, an inventory of items entrusted to the living center for safekeeping will be compiled. At the time of discharge or death, these items will be distributed to the resident, legal representative or responsible party. All personal items must be recovered from the living center within 30 days from the date of discharge or death. If the items are not recovered within 30 days, the living center reserves the right to dispose of all personal belongings as it sees fit. **This living center does not accept responsibility for personal belongings, which** the resident elects to keep in their own possession.

## CONSENTS AND RELEASES

**AUTHORIZATION FOR TREATMENT:**
The resident hereby authorizes the professional staff of the living center to administer necessary nursing procedures, podiatric procedures, skin scrapings, non surgical dental procedures, and laboratory and x-ray procedures on the resident while the resident is in the living center. This consent may be withdrawn at any time. The resident understands that an additional consent will be needed for any surgical treatment, or for any treatment requiring the use of general anesthesia.

The resident has read, and has had fully explained to him/her, and fully understands the above Authorization for Treatment. No guarantee or assurance has been made concerning the results that may be obtained.

**ACTIVITY RELEASE:**
I hereby DO/DO NOT (Please Circle) authorize **«Residents Name»** to participate in planned recreational activities, in accordance with Physician's orders, both on and off the living center premises. I understand that each resident is encouraged, but not forced to participate. Furthermore, I accept complete responsibility for the above named residents while away from the living center, and absolve the management of said living center, its personnel, and the attending physician of responsibility.

**PHOTOGRAPHY RELEASE:**
I hereby DO/DO NOT (Please Circle) authorize the living center, staff, or those requested by the staff to photograph and use said photographs, negatives or prints as may be deemed necessary for identification purposes, activities and, if the need arises, for medical purposes.

**LAUNDRY CONSENT:**
I hereby DO/DO NOT (Please Circle) authorize the living center to maintain the personal laundry for **«Residents Name»**. All personal laundry items will be laundered by the living center at the rate of $_____ 0 _____ per month. The living center will not accept responsibility for loss or damage. The living center reserves the right to increase its charge with proper notice to the resident or responsible party.

**PHYSICIAN CONSENT AND IDENTIFICATION OF HOW TO CONTACT** Document 8-9 Filed 05/30/12   Page 12 of 12

It is the policy of this living center to encourage use of one's own personal physician as long as the physician is licensed in the appropriate state and agrees to comply with the rules and regulations of this living center and appropriate state agencies. If a resident does not have a personal physician, one will be appointed by the living center.

Your physician is: _Abraham_

Address: _____

Phone Number: _____

## SELF-ADMINISTRATION OF MEDICATION:

It is the policy of this living center that the resident has the right to self administer his or her own medication if the interdisciplinary team has determined that this practice is safe. The following criteria must be met:

1. Physician's orders for administration of medication must be on file at the living center (may be all or a specific drug).
2. The resident has signed a document stating his/her desire to self medicate.
3. The level of ability to identify medication, dosage, time and to store properly has been determined as safe by the interdisciplinary team.
4. A safe storage place, plan for documentation and a method of accountability has been established.
5. If at any time the interdisciplinary team determines the practice is unsafe, the resident and physician will be notified.

As stated above, every resident has the right to self--administer their medications as long as this practice does not pose a danger to the resident or to other residents of the living center.

## RESTRAINT POLICY:

I do hereby acknowledge that **«Residents_Name»** has the right to be free from any physical or chemical restraints administered for the purpose of discipline or convenience and not required to treat the resident's medical symptoms.

It is the policy of this living center that all residents remain restraint free, unless indicated in writing by the attending physician that specifies the duration and the circumstances under which the restraints are to be used.

## AUTHORIZATION FOR PAYMENT AND RELEASE OF INFORMATION

I hereby authorize the living center to utilize the Part B programs and or suppliers of their choice. Additionally, I authorize the living center to bill Medicare, Medicaid, and any other insurance carrier with whom I may have coverage. I request that payment of authorized insurance benefits be made directly to the supplier with whom the living center is contracted. I authorize any holder of medical information about its agents, the living center's supplier, and me to release to the insurance company involved any information needed to determine these benefits for related services.

Signature _Sharon J. Hogsett_                     Date _3-11-10_

Witness _CN Vaishilos_

**Note:** If the resident is unable to sign, complete authorizing signature Section below.

Authorized Signature and Relationship _dtr_                Date _____

Reason Resident Could Not Sign: _not present_

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

SHERVON HOGSETT, Individually,
and as Administratrix of the Estate of
Patricia Joyner, deceased, and GARY
JOYNER, Individually,

       Plaintiffs,

v.

Parkwood Nursing & Rehabilitation
Center, Inc., Parkwood Living Center,
LLC, HMR Advantage Health Systems,
Inc., Scepter Health & Rehab of
Snellville, LLC, Covenant Dove, Inc.,
Covenant Dove, LLC, Covenant Dove
Holding Company, LLC, Ark Holding
Company, Inc., and Ark Holdings, LLC.

       Defendants.

CASE NO. 1:12-cv-01399-JEC

## DECLARATION OF ZACHARY WOOD

      1.     My name is Zachary Wood.  I am over twenty-one years of age.  I

make the statements in this declaration based on my personal knowledge.

      2.     I am the Administrator of Scepter Health & Rehab of Snellville f/k/a

Parkwood Living Center (the "Facility").

      3.     The admission files for residents of the Facility are kept within the

Facility in the regular course of business.

4717956v2



4.    I have searched the files and located the admission records for Patricia Joyner, a resident of the Facility from March 11, 2010 through March 24, 2010.

5.    Attached hereto as Exhibit 1 is a true and correct copy of Patricia Joyner's Admission Agreement dated March 11, 2010.

6.    Attached hereto as Exhibit 2 is a true and correct copy of Patricia Joyner's Arbitration Agreement dated March 11, 2010.

7.    I have reviewed the Facility's billing records for Patricia Joyner, which show that a portion of her care was paid for by Medicare, a federal government program providing health insurance coverage to people who are aged 65 and over, or who meet other special criteria.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 16, 2012.

Zachary Wood

4717956v2                                        - 2 -

## EXHIBIT 1
(Admission Agreement)

H M R

## ADVANT/GE
HEALTH SYSTEMS

## ADMISSION AGREEMENT

Eligibility for Medicaid-sponsored long-term care services is based on income and medical necessity. To qualify for assistance through the Medicaid program, a living center resident must need intermediate or skilled nursing care as determined through an assessment conducted by Medicaid program staff. The fact that a resident has already been admitted to a living center is not considered in this determination. It is possible that a resident could exhaust all other means of paying for living center care and meet Medicaid income criteria but still be denied assistance due to the lack of medical necessity.

It is recommended that all persons seeking admission to a living center be assessed by the Medicaid program prior to admission. This assessment will provide information about the level of care needed and the viability of community services as an alternative to admission.

A resident is not deemed admitted until such time as all agreements required by law have been properly executed. It is the policy of this living center to admit residents only upon written order of the attending physician.

Throughout this Agreement the term a resident I refers to the resident, or where applicable to any person who may, under Georgia law, act on the resident's behalf when the resident is unable to act for himself or herself, or where applicable any person who the resident has delegated decision-making authority. The resident's incapacity or delegation of decision-making authority must be documented in the living center's records in compliance with applicable Georgia statutes. The resident must provide copies of any existing powers of attorney, court orders or ' other applicable documentation prior to admission.

The resident's admission to the living center is subject to the terms and conditions described in this Admission Agreement, the resident's Financial Agreement and applicable living center policies and procedures. The resident shall be admitted only upon execution of all required agreements, completion of a satisfactory physical and social assessment by living center personnel, completion of any required physical examination, and the living center's receipt of a health status certification and an admission order from the resident's attending physician or another physician authorized to admit to the living center.

## SERVICES PROVIDED

1. **Room Board/Nursing Care.** The living center agrees to furnish room, meals as required by the resident, social services, activities, nursing care, or custodial care, as may be required for the well being of the resident. This provision expressly excludes extraordinary services, including but not limited to private duty nursing and private sitters. In addition, the living center, in conjunction with the resident and the resident's health care providers, will develop and maintain a written plan of care which addresses the resident's medical, nursing, social and dietary needs. This plan of care will be periodically reviewed and revised as necessary, to meet the needs of the resident.

2. **Personal Property/Trust Funds.** The living center will maintain written records of all financial transactions with the resident. In the event that the resident wishes for the living center to hold personal property in trust, the living center must be given a written inventory, verified by an employee of the Living center, and the property must be held in trust in accordance with the rules and policies of the living center. The resident has a right to have personal funds held on his/her behalf by the living center. The living center will provide the resident with an accounting of all funds held in trust in accordance with all applicable state and federal regulations, whichever are more stringent.

3. **Physician Services.** Upon execution of this agreement, the living center agrees to admit residents with physician's order or with provisions made therefore, and assist in obtaining the services of a physician if a personal physician becomes unavailable, and obtain emergency physician services when required. In all cases, the physician so retained will bill the resident, Medicare or Medicaid directly, and the living center will not be responsible for payment of the bill for such service. The resident understands and acknowledges that the attending physician is not an employee of the living center and that the living center is neither liable nor responsible for the acts or omissions of the attending physician.

4. **Medications.** The living center will obtain and administer such medications as may be prescribed, the cost of which shall not be the responsibility of the living center, except under specific circumstances associated with third party payers.

5. **Insurance.** The living center will assist in application for private insurance benefits and will accept assignment of these benefits. The living center will assist the resident in applying for Medicare or Medicaid benefits where applicable.

6. **Transfers.** The living center will arrange for prompt transfer of the Resident to a hospital upon physician's orders, or in an emergency situation. Expenses of transfer and care of the resident at the hospital are not: the responsibility of the living center.

7. **Linens.** The living center will provide bed and bath linens as required for the proper care of the resident, under normal conditions. The resident or someone acting on the resident's behalf shall supply all other personal clothing. In the interest of meeting the needs of all of our residents, the living center requests that the amount of clothing be sufficient.

8. **Transmissions.** The living center will automatically send computerized assessments and care plans upon admission to the State, your intermediary provider and HCFA. This system will not affect the resident's level of care or payment source.

The living center staff will work with the resident and his/her attending physician to formulate a plan of care for the resident at the time of resident's admission to the living center. This care plan will be updated periodically to take into account the resident's current health status and physical and social needs.

The resident has the right to request a copy of the care plan and to receive explanatory information about the care plan during his/her stay at the living center.

## RESIDENT RESPONSIBILITIES

1. The resident will provide complete personal and medical information to the living center as requested. The resident will provide a medical history, physical examination, current doctor's orders, and doctor's statement that the resident is free from communicable disease on admission of resident or within the required time limitation. If the resident is suffering from a communicable disease, the resident will provide a physician's certificate that the disease is not in a transferable stage, or that adequate or appropriate isolation measures are being carried out to control transmission of the disease. The living center retains the right to refuse admission to any resident suffering from a communicable disease, whether that disease is in a transferable stage or not, so long as said refusal is in compliance with state and federal law. It is the policy of this living center that admission is dependent upon the living center's ability to provide appropriate medical and nursing care. The living center's ability to provide adequate care is the predominate criteria in admitting or not admitting a resident with a known communicable disease or infection. The living center adheres to a policy of making admissions decisions without regard to race, color, sex, national origin, citizenship or age.

2. The resident will permit authorized staff of the living center to perform such nursing and custodial care functions as are necessary to maintain the well being of the resident, including but not limited to assistance with activities of daily living, dressing, performance of restorative nursing care, and performance of therapies as deemed necessary by a physician.

3. The resident agrees to pay all fees and charges described in this Agreement upon the terms agreed to.

4. The resident accepts full responsibility for and absolves and releases the living center, its personnel, Medical Director, management, owners and attending physician from any liability for any event, accident, or deterioration of medical condition while the resident is away from the living center and not under the direct care and supervision of the living center, or if the resident should leave the living center for any reason without first giving notice.

## DISCHARGE

Under Federal law the resident may only be transferred or discharged from this living center for one of the following reasons:

1.    It is necessary for your welfare and your needs cannot be met in this living center.

2.    Your health has improved sufficiently so that you no longer need the services provided by this living center.

3.    The safety of individuals in this living center is endangered.

4.    The health of individuals in this living center would otherwise be endangered.

5.    You have failed, after reasonable and appropriate notice, to pay for (or to have paid under Medicare or Medicaid) a stay at this living center.

6.    The living center ceases to operate.

Any discharge of a resident shall be conducted in accordance with applicable cause, notice, documentation, appeal and other standards set forth in the living center's policies and/or in pertinent state or federal, law. Or regulation.

## FINANCIAL AGREEMEN

The resident authorizes any and all nursing centers; hospitals, physicians and other medical care providers to furnish any medical or financial information to the following organizations at their request:

>The Living center
>Third-Party Payor
>The Social Security Administration Fiscal Intermediaries and carriers Hospitals
>Appropriate State or County Agencies Insurance Companies

## A.    PRIVATE PAY RESIDENTS

1. Daily Rate. The Living center's current private pay and optional service charges are set out in Attachment A. This daily rate is determined in part by the type of room assigned to the resident and, therefore, may be changed if the resident is transferred to a different room. A charge in the amount of the basic daily rate shall be made for the day of admission but: not for the day of discharge, except that a late discharge fee on the amount of the agreed basic daily rate may be charged if the resident fails to vacate his room by 12:00 noon on the date of discharge. The resident and the responsible party agree to pay a sum equal to one month in advance, plus ancillaries, if applicable, and thereafter pay for each successive months stay in advance, payable upon receipt of the statement. If the resident is admitted to the living center as a private pay resident and subsequently converts to a Medicaid resident, the living center shall refund any unused advance payment. The living center shall also refund any unused advance payment in the event that the resident leaves the living center prior to the end of the first month.

2. Extra Services Supplies. The resident shall be responsible for payment of all charges of the living center for supplies or services, which are not included in the living center's daily rate.

3. Bed Hold. Residents leaving the center for any length of time to any location may elect to hold the bed by paying the daily rate. In the case of an absent resident whose cost of care is paid f or by the Medicaid Program. Or any other State or Federal program he/she may reserve the bed for The number of days the living center is reimbursed the per diem costs of that Resident's care as if the resident were actually in the living center; however, in No case will the living center reserve the bed for longer than___days at the Per them rate.    Should the reservation days expire under the Medicaid program? The responsible party shall have the option of retaining the bed at private Rates for the length of time deemed necessary by the said parties. The rate of charge is not refundable and should the resident return to the living center and re-qualify for Medicaid, private rates would cease on the date of return to the Medicaid program. There is no refund on bed hold days. **Please note that not all state Medicaid programs** pay for bed holds. THIS **STATE DOES/DOES NOT (Please circle) PAY FOR BED** HOLDS.

B. **MEDICAID RESIDEN**

1. **Daily Rate Payment.** Services provided under the Medicaid program administered by the State and optional service charges are set out in Attachment B. services requested or required by the resident and the cost of such services, which are not covered by Medicaid, are also set out in -Attachment B and are the responsibility of the resident.

2. **Termination of Coverage.** The resident may remain in the living center only so long as certified eligible for Medicaid payments, or as long as any charges owed by the resident are paid as due. Residents who remain beyond the expiration of their Medicaid coverage, or who have their coverage retroactively terminated or denied shall be obligated to pay their account as private paying residents with rates and charges for services rendered at the regular rates and terms in effect at the time of the service.

3. **Resident's Share of Cost.** The Medicaid program determines the available monthly income of all persons receiving Medicaid assistance and, with respect to most Medicaid beneficiaries, requires that out of that income the beneficiary must bear a reasonable share of cost. Payment of that share is the responsibility of the resident. The resident's share of cost is subject to change as authorized by law or regulation. **The resident and the responsible party agree to pay the residents actual or estimated monthly liability amount equal to one month in advance.** If the resident fails to make prompt payment of his or her share of cost, where appropriate, the living center may require direct mailing of such monies to the living center. Such monies will be managed by the living center in accordance with all applicable laws and regulatory requirements. The resident ' acknowledges that failure to pay the resident's share of cost may constitute grounds for discharge of' the resident for non-payment of the resident's stay and the living center will notify the. Appropriate state or federal agency of such non-payment.

C. **MEDICARE RESIDENTS**

1. **Daily Rate Payment.** Services provided for payment made under the Medicare program and optional service charges are set out in **Attachment C.** Services and charges for services, which are not covered by Medicare, are also set out in **Attachment C** and must be paid f or by the resident.

2. **Limited Coverage.** The resident understands that Medicare coverage is established by federal guidelines and not by the living center. Medicare coverage is limited both as to the level of care covered and the duration of coverage. Thus, based upon Medicare criteria, Medicare coverage may be terminated prior to the use of all allotted days if the resident ceases to meet such criteria.

3. **Expiration of Benefits.** At admission any resident who is eligible for Medicare coverage must provide documentation that the resident has a method of payment for the services rendered in the living center upon the expiration of such coverage. If the resident intends to leave the living center upon expiration of Medicare benefits, he/she must advise the living center at the time of admission.

If a resident will become Medicaid eligible when Medicare eligibility expires, the resident will be responsible for making a timely and complete application for Medicaid benefits. The living center will assist with the application process when requested to do so. The resident is responsible for periodically checking with the appropriate state agency to seek and receive information on the status of the resident's Medicaid application, or may request that the living center seek and receive such information. The living center will not seek or accept a deposit or other advance payment from residents who convert from Medicare to Medicaid eligibility.

If the resident will convert to private pay status when Medicare eligibility expires, the resident will be required to make a deposit equal to one month of the living center's private pay daily rate, plus one month of applicable optional service charges upon conversion to private pay status.

## RATE ADJUSTMENTS

1. Private Pay Per Diem and Optional Service Charges. The living center may find it necessary, due to inflation or other factors, to increase the private pay daily rate and/or the rate charges for optional services from time to time.

2. Change in Level of Care. The resident's daily rates and optional service charges may be affected by a change in the level of care the resident is receiving at the living center.

3. Changes in Payment Source. Upon the resident's change in payment source (e.g. from Medicare to Medicaid or from Private Pay to Medicare Or Medicaid), the resident's daily rates and optional service charges will be adjusted to account for applicable rates then in effect.

4. Changes in Third Party Payer Requirements. The resident's cost share responsibilities (including co-payments, coinsurance and Deductibles) under the Medicare or Medicaid programs, or under a Private insurance program may vary based upon changes in federal or State laws or regulations, or changes in payer policies.

5. Notice of Rate Changes/Resident's Rights. The living center will notify the resident at least thirty (30) days in advance of any Changes in rates. Private pay residents who object to changes in the private pay daily rate may elect to leave the living center by giving the living center written notice to that effect within the thirty (30) days notice period; provided, however, the rate increase shall apply for those days the resident is in the living center awaiting discharge or transfer beyond the thirty (30) day notice period. Residents who object to changes in optional service charges may elect to terminate their optional service arrangements by giving the living center written notice of their desire during the thirty (30) day Notice period. Residents shall otherwise be deemed to have consented to the rate changes if written notice as described in this section is not provided within the thirty (30) day notice period.

**D.     TIMELY OBLIGATIONS TO PAY**

The resident's account for services rendered by the living center shall be billed monthly to the resident.

**E.     DUE DATE**

Bills for services rendered to resident by the living center which are not paid upon receipt of the statement shall be past due or delinquent. When payment for services is not made by the fifteenth (15th) day of every billing month, the resident's account may be assessed a delinquency charge at the monthly rate of one and one-half percent (1-1/2%) (Or the maximum amount permitted by law, whichever is greater) of the outstanding balance.

The resident acknowledges      t the delinquency charge does nc __ lter any obligations of either the living center or the resident or his or her responsible party or agent under this agreement.

The resident and/or responsible party or agent acknowledge that the living center does not grant credit or allow installment payments, and the living center's acceptance of partial payment shall not limit the living center's right under this agreement.

### F.    FAILURE TO PAY

If the resident fails to make a payment required hereunder when same becomes due and payable, and this delinquency continues for a period of fifteen (15) days from the due date, the living center may discharge the resident in accordance with applicable cause, notice, documentation, appeal and other standards set forth in the living center's policies and/or in pertinent state or federal law or regulation. The resident shall be responsible for all relocation expenses, in addition to all charges due to the living center for care received prior to his/her discharge. Nothing in this section shall be construed to limit the living center's rights to file an action at law or in equity to collect the balance due and owing to the living center.

### G.    INSURANCE COVERAGE

Where the resident's care at the living center is covered by insurance or some other third party payor coverage, the resident shall nonetheless be primarily responsible for making payments pursuant to this agreement regardless of such third party payer coverage, and shall be responsible for paying all charges not paid by any third party payer including any coinsurance or deductible amounts required by any third party payer, according to the living center's payment schedule.

### H.    FEE FOR RETURNED CHECKS

A service fee of twenty-five dollars ($25.00) will be charged for any returned check.

## REFUND POLICY

The refund of the unused portion of prepaid fees and charges will be made within approximately six to eight weeks following discharge. In the event of resident's death, refunds will be made in accordance with state and federal law. Any personal property belonging to the resident in the living center at the time of the resident's discharge from the living center will be released in accordance with the state and federal law.

Case 1:12-cv-01309-JEC   Document 13-1   Filed 05/25/12   Page 12 of 17

# PROTECTION OF RESIDENT'S PERSONAL FUNDS

This living center has a policy of complying with state and federal rules and regulations as it relates to protection of a resident's personal funds. As a resident you are not required to deposit your personal funds with the living center. However, upon your request, we will hold, safeguard, manage and account for your personal funds as they are deposited with the living center. All funds deposited in the living center will be placed in an interest bearing account that is separate from the living center's operating account. On a monthly basis, the interest earned will be credited to your account.

If you are a Medicaid resident, we will notify you when the amount in your account reaches $200.00 less than the Medicaid resource limit for one person, and if it appears that you may lose your eligibility for Medicaid. Of course, we cannot notify you of information of which we have no knowledge.

Upon the death of a resident, this living center will promptly convey, within approximately six to eight weeks, the resident's funds and a final accounting of those funds to the individual or probate jurisdiction administering the resident I s estate. This living center maintains a surety bond to assure the security of your personal funds. If the resident- had a resident trust fund at the living center, a final accounting and final disbursement of funds will occur within 30 days of discharge.

I, «Residents Name» do hereby request that my Personal funds be held, safeguarded, managed and accounted for by this Living center.

I, «Responsible Party» responsible party for «Residents Name» A resident, and do hereby Request that his/her personal funds be held, safeguarded, managed and Accounted for by this living center.

_____          _____
Signature of Resident or Legal Representative          Date

Identity of the individual authorized to accept funds upon my discharge from the living center:

NAME: _____PHONE: _____

ADDRESS: _____

RESIDENT: _____DATE: _____

## BILL OF RIGHTS

I acknowledge that I have received a copy of the Bill of Rights for Residents of Long Term Care Facilities and have had this information-Explained to me by a member of the living center's staff.

Signature of Resident _Sharon J Hogsett_    Date _3-11-10_

## RESIDENT'S PERSONAL PROPERTY

Upon admission, an inventory of items entrusted to the living center for safekeeping will be compiled. At the time of discharge or death, these items will be distributed to the resident, legal representative or responsible party. All personal items must be recovered from the living center within 30 days from the date of discharge or death. If the items are not recovered within 30 days, the living center reserves the right to dispose of all personal belongings as it sees fit. **This living center does not accept responsibility for personal belongings, which** the resident elects to keep in their own possession.

## CONSENTS AND RELEASES

**AUTHORIZATION FOR TREATMENT:**
The resident hereby authorizes the professional staff of the living center to administer necessary nursing procedures, podiatric procedures, skin scrapings, non surgical dental procedures, and laboratory and x-ray procedures on the resident while the resident is in the living center. This consent may be withdrawn at any time. The resident understands that an additional consent will be needed for any surgical treatment, or for any treatment requiring the use of general anesthesia.

The resident has read, and has had fully explained to him/her, and fully understands the above Authorization for Treatment. No guarantee or assurance has been made concerning the results that may be obtained.

**ACTIVITY RELEASE:**
I hereby **DO/DO NOT** (Please Circle) authorize **«Residents Name»** to participate in planned recreational activities, in accordance with Physician's orders, both on and off the living center premises. I understand that each resident is encouraged, but not forced to participate. Furthermore, I accept complete responsibility for the above named residents while away from the living center, and absolve the management of said living center, its personnel, and the attending physician of responsibility.

**PHOTOGRAPHY RELEASE:**
I hereby **DO/DO NOT** (Please Circle) authorize the living center, staff, or those requested by the staff to photograph and use said photographs, negatives or prints as may be deemed necessary for identification purposes, activities and, if the need arises, for medical purposes.

**LAUNDRY CONSENT:**
I hereby **DO/DO NOT** (Please Circle) authorize the living center to maintain the personal laundry for **«Residents Name»**. All personal laundry items will be laundered by the living center at the rate of $ _0_ per month. The living center will not accept responsibility for loss or damage. The living center reserves the right to increase its charge with proper notice to the resident or responsible party.

PHYSICIAN CONSENT AND NOTIFICATION OF HOW TO CONTACT

It is the policy of this living center to encourage use of one's own personal physician as long as the physician is licensed in the appropriate state and agrees to comply with the rules and regulations of this living center and appropriate state agencies. If a resident does not have a personal physician, one will be appointed by the living center.

Your physician is: _Abraham_____

Address: _____

Phone Number: _____

## SELF-ADMINISTRATION OF MEDICATION:

It is the policy of this living center that the resident has the right to self administer his or her own medication if the interdisciplinary team has determined that this practice is safe. The following criteria must be met:

1. Physician's orders for administration of medication must be on file at the living center (may be all or a specific drug).
2. The resident has signed a document stating his/her desire to self medicate.
3. The level of ability to identify medication, dosage, time and to store properly has been determined as safe by the interdisciplinary team.
4. A safe storage place, plan for documentation and a method of accountability has been established.
5. If at any time the interdisciplinary team determines the practice is unsafe, the resident and physician will be notified.

As stated above, every resident has the right to self--administer their medications as long as this practice does not pose a danger to the resident or to other residents of the living center.

## RESTRAINT POLICY:

I do hereby acknowledge that **«Residents Name»** has the right to be free from any physical or chemical restraints administered for the purpose of discipline or convenience and not required to treat the resident's medical symptoms.

It is the policy of this living center that all residents remain restraint free, unless indicated in writing by the attending physician that specifies the duration and the circumstances under which the restraints are to be used.

## AUTHORIZATION FOR PAYMENT AND RELEASE OF INFORMATION

I hereby authorize the living center to utilize the Part B programs and or suppliers of their choice. Additionally, I authorize the living center to bill Medicare, Medicaid, and any other insurance carrier with whom I may have coverage. I request that payment of authorized insurance benefits be made directly to the supplier with whom the living center is contracted. I authorize any holder of medical information about its agents, the living center's supplier, and me to release to the insurance company involved any information needed to determine these benefits for related services.

Signature _Sharon Hogsett_____    Date _3-11-10_____

Witness _M Naishilos_____

**Note:** If the resident is unable to sign, complete authorizing signature Section below.

Authorized Signature and Relationship _dtr_____    Date _____

Reason Resident Could Not Sign: _not present_____

**EXHIBIT 2**
(Arbitration Agreement

# HMR/Advantage Health Systems, Inc.

# Parkwood Living Center

# AGREEMENT TO ARBITRATE

To avoid undue expense, delay, and uncertainty in the prosecution of a civil action, the parties to this Agreement to Arbitrate agree to submit the issues outlined herein to binding arbitration in accordance with the United States Arbitration Act, 9 U.S.C. §§ 1 to 207 ("Federal Arbitration Act"). Any civil action, the subject matter of which is encompassed by this Agreement to Arbitrate, shall be stayed pending any award issued pursuant to this Agreement to Arbitration. This Agreement to Arbitration shall be governed by and interpreted under the Federal Arbitration Act. The Living Center includes the particular facility where the Resident resides, its parents, affiliates, owners, officers, agents, and employees (collectively, the "Living Center").

**CLAIMS SUBJECT TO ARBITRATION**: Any and all claims or controversies arising out of or in any way relating to the Resident's stay at the Living Center including the care and treatment received by the Resident at the Living Center shall be submitted to binding arbitration pursuant to the Federal Arbitration Act. This right to demand arbitration includes, without limitation, disputes regarding interpretation of this Agreement, disputes arising under state or federal law, either currently existing or arising in the future, including claims for statutory, compensatory, or punitive damages and claims based on breach of contract, tort, negligence, or breach of statutory duties.

**SELECTION OF ARBITRATOR**: The parties shall agree upon an arbitrator. If the parties cannot reach an agreement regarding the choice of an arbitrator within twenty (20) days of submission of the arbitration demand, the parties shall request from the American Health Lawyers Association a list of five potential arbitrators from which one will be selected. Either party may elect that the matter be heard by three (3) arbitrators, all to be chosen by the above method.

**APPLICABLE LAW**: Subject to the limitations herein and to the extent applicable, the arbitration shall be conducted in accordance with the Georgia Rules of Civil Procedure, the Georgia Rules of Evidence, and the American Health Lawyers Association Rules for Arbitration. Any dispute concerning the applicable law shall be resolved by the arbitrator(s).

**DISCOVERY**: Notwithstanding the provisions above, each party shall be allowed to depose a maximum of three (3) non-expert witnesses. Each party is limited to two (2) expert witnesses and depositions shall be limited to four (4) hours per expert and/or witness. No later than fourteen (14) working days before the arbitration hearing, the parties shall exchange a list of witnesses, a list of exhibits, and any sworn statements to be relied upon at the arbitration.

**LOCATION**: All arbitration hearings shall be held at a place designated by the arbitrator(s) in the county in which the Living Center is located or at a location mutually agreed upon by the parties.

**COSTS**: The fees of the Arbitrator shall be shared equally by the parties. Each party shall bear its own attorneys' fees and costs unless otherwise set forth in the arbitration award.

GA

Rev. 4/09

The Resident and the Living Center expressly agree and voluntarily enter into this binding Agreement to Arbitrate.  By my signature below I affirm that I understand that I am voluntarily signing this Agreement to Arbitrate.  I further affirm that I understand that not signing this Agreement will have no effect on the admission process or care and treatment provided by the Living Center.

**THIS AGREEMENT TO ARBITRATE CONSTITUTES
A WAIVER OF THE RIGHT TO A TRIAL BY JURY.**

**I AGREE TO THE TERMS OF THIS AGREEMENT TO ARBITRATE.**

_Patricia Joyner_
Name of Resident----Please Print

_____        _____
Signature of Resident                    Date

_Shervon Hogsett_
Name of Legal Representative/Caretaker—Please Print

X _Shervon J. Hogsett_                    _3-11-10_
Signature of Legal Representative/Caretaker     Date

_Cara Naismilos_
Name of Living Center Representative—Please Print

_CNaismilos_                              _3/11/10_
Signature of Living Center Representative         Date

2

Rev. 4/09

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SHERVON HOGSETT, individually,
and as Administratrix of the
Estate of PATRICIA JOYNER,
deceased, and GARY JOYNER,
individually,

       Plaintiffs,

                    CIVIL ACTION NO.

v.                  1:12-cv-1399-JEC

PARKWOOD NURSING &
REHABILITATION CENTER, INC.,
PARKWOOD LIVING CENTER, LLC,
HMR ADVANTAGE HEALTH SYSTEMS,
INC., SCEPTER HEALTH & REHAB OF
SNELLVILLE, LLC, COVENANT DOVE,
INC., COVENANT DOVE, LLC,
COVENANT DOVE HOLDING COMPANY,
LLC, ARK HOLDING COMPANY, INC.,
and ARK HOLDINGS, LLC,

       Defendants.

## ORDER

This case is before the Court on plaintiffs' Motion [16] to Amend and Clarify the Court's March 6, 2013 Order [15] to reflect that plaintiff Gary Joyner is decedent's son rather than her spouse. The Court **GRANTS** plaintiffs' Motion [16]. In conjunction with this ruling, the Court will issue a separate order amending the March 6, 2013 Order [15] to correct the inaccuracy noted by plaintiffs.

AO 72A
(Rev.8/82)

SO ORDERED, this 14th day of February, 2014.


/s/ Julie E. Carnes
JULIE E. CARNES
CHIEF UNITED STATES DISTRICT JUDGE

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SHERVON HOGSETT, individually,
and as Administratrix of the
Estate of PATRICIA JOYNER,
deceased, and GARY JOYNER,
individually,

       Plaintiffs,

v.                                            CIVIL ACTION NO.

                                 1:12-cv-1399-JEC

PARKWOOD NURSING &
REHABILITATION CENTER, INC.,
PARKWOOD LIVING CENTER, LLC,
HMR ADVANTAGE HEALTH SYSTEMS,
INC., SCEPTER HEALTH & REHAB OF
SNELLVILLE, LLC, COVENANT DOVE,
INC., COVENANT DOVE, LLC,
COVENANT DOVE HOLDING COMPANY,
LLC, ARK HOLDING COMPANY, INC.,
and ARK HOLDINGS, LLC,

       Defendants.

## AMENDED ORDER & OPINION

This case is before the Court on defendants' Motion to Dismiss
or Stay Proceedings and Compel Arbitration [4] and defendant Covenant
Dove Holding Company's Motion to Dismiss for Lack of Personal
Jurisdiction [3].  The Court has reviewed the record and the
arguments of the parties and, for the reasons set out below,
concludes that defendants' Motion to Dismiss or Stay and Compel
Arbitration [4] should be **DENIED** and that defendant Covenant Dove

AO 72A
(Rev.8/82)

Case 1:12-cv-01399-JEC   Document 24   Filed 02/18/14   Page 2 of 24

Holding Company's Motion [3] should be **GRANTED as unopposed**.

<u>BACKGROUND</u>

On March 11, 2010, the defendant long-term care facility Parkwood Nursing and Rehabilitation Center ("Parkwood") admitted 63-year old Patricia Joyner. (Compl. [1] at 8-9.) Doctors had recently amputated the lower part of Joyner's left leg, and the goal of Joyner's stay at Parkwood was for her to regain limited mobility so that she might live on her own with caregiver assistance. (*Id.*) Joyner was listed in "fair" condition upon her arrival at Parkwood, and there is no indication that she was not coherent or that she was unable to make decisions. (*Id.*)

When Joyner was admitted to Parkwood, her daughter Shervon Hogsett signed numerous papers on her mother's behalf, including an arbitration agreement. (Defs.' Mot. to Dismiss or Stay and Compel Arbitration [4] ("Defs.' Mot. to Dismiss") at Exs. A & B.) The arbitration agreement is quite broad, covering all potential disputes related to Joyner's stay at Parkwood, including any contractual disputes or torts.[1] The agreement explicitly provides: "This

---

[1] "<u>Claims Subject To Arbitration</u>: Any and all claims or controversies arising out of or in any way relating to the Resident's stay at the Living Center including the care and treatment received by the Resident at the Living Center shall be submitted to binding arbitration pursuant to the Federal Arbitration Act. This right to demand arbitration includes, without limitation, disputes regarding interpretation of this Agreement, disputes arising under state or federal law, either currently existing or arising in the future,

2

agreement to arbitrate constitutes a waiver of the right to a trial by jury." (*Id.* at Ex. B.)

On the last page of the arbitration agreement, below the sentence "I AGREE TO THE TERMS OF THIS AGREEMENT TO ARBITRATE," there is a line on which the name of the resident is to be printed and a line where the signature of the resident is to be affixed. (*Id.*) On the line calling for the printed name is the correct name of the resident: "Patricia Joyner." (*Id.*) However, the signature line for the resident is blank. (*Id.*) Just below this section, there are two lines for the printed name and signature of the "legal representative/caretaker." (Defs.' Mot. to Dismiss [4] at Ex. B.) These lines contain the printed name and signature[2] of Shervon Hogsett, along with the date "3-11-10." (*Id.*) Finally, just below the lines for the legal representative are two lines calling for the printed name and signature of the Living Center representative, which contain the name "Cara Waiswilos" and the date "3/11/10." (*Id.*)

An admission agreement was also presented to Hogsett for her signature. (*Id.* at Ex. A.) The admission agreement states that the

---

including claims for statutory, compensatory, or punitive damages and claims based on breach of contract, tort, negligence, or breach of statutory duties." (*See* Defs.' Mot. to Dismiss [4] at Ex. B, 1.)

[2] Written in pen next to the signature of Ms. Hogsett is an "x," which presumably was inserted by the Parkwood representative to show Ms. Hogsett where to sign.

3

term "resident" refers to the resident,

> or where applicable to any person who may under Georgia law, act on the resident's behalf when the resident is unable to act for himself or herself, or where applicable any person who the resident has delegated decision-making authority.  The resident's incapacity or delegation of decision-making authority must be documented in the living center's records in compliance with applicable Georgia statutes.  The resident must provide copies of any existing powers of attorney, court orders or other applicable documentation prior to admission.

(*Id.* at 2.)

The admission agreement contains several pages of information about the care to be provided by the Center, as well as the financial obligations of the resident.  At the conclusion of the agreement, there is an authorization for payment and release of information, with accompanying signature lines.  (Defs.' Mot. to Dismiss [4] at Ex. A, 12.)   The "signature" line was completed by "Shervon J. Hogsett" and witnessed by "CWaisilos." (*Id.*)  Below the signature is the following admonition:  **Note**: If the resident is unable to sign, complete authorizing signature Section below." (*Id.*)  Under that note is a line marked "Authorized Signature and Relationship" and "Reason Resident Could Not Sign." (*Id.*)  In the block for authorized signature and relationship is the hand-written abbreviation "dtr," which presumably stands for "daughter," and in the block for the reason why the resident could not sign are the hand-written words "not present." (*Id.*)

4

In short, Hogsett signed the arbitration agreement for her mother, Patricia Joyner. Joyner did not sign any of the admissions paperwork. Although Hogsett signed the agreement under the blank calling for "legal representative/caretaker," the parties agree that Hogsett had no legal status as her mother's representative.[3] That is, Hogsett had no power of attorney nor was she her mother's guardian. Neither is there any indication that Hogsett represented to Parkwood staff that she had any such legal status.

Eight days after Joyner was admitted, her doctor provided Parkwood with a recommendation regarding the treatment of a wound on Joyner's partially amputated left leg. (Compl. [1] at 9.) According to plaintiffs, no one at Parkwood acted on the recommendation between March 19 and March 22, 2010, leading to a deterioration in Joyner's condition. (*Id.*) By the time she received treatment, Joyner's leg was infected beyond repair. (*Id.*) Joyner died in a nearby hospital on March 26, 2010, fifteen days after her admittance to the Parkwood facility. (*Id.*)

Plaintiffs are Joyner's daughter Hogsett and her son Gary Joyner. They have sued defendant Parkwood and affiliated entities, asserting negligence, breach of contract, wrongful death, and other claims. Plaintiffs Hogsett and Gary Joyner have brought the wrongful

---

[3]  Whether Hogsett was her mother's caretaker is not discussed in the briefing.

5

death claims in their individual capacities.  Plaintiff Hogsett also
originally brought claims in her representative capacity on behalf of
Joyner's estate, but has now dismissed those claims.[4]

Defendants seek to dismiss plaintiffs' claims and to compel
arbitration on those claims based on the agreement signed by Hogsett.[5]
Plaintiffs argue that the arbitration agreement is not binding on
them, as Ms. Joyner never signed the agreement and as Hogsett had no
authority to bind her mother to such an agreement.  Defendants argue
that plaintiffs should be bound by Ms. Hogsett's signature on the
arbitration agreement.

<u>DISCUSSION</u>

I.   **<u>ENFORCEABILITY OF ARBITRATION AGREEMENT AS TO CLAIMS NOT MADE BY
PLAINTIFF SHERVON HOGSETT IN HER INDIVIDUAL CAPACITY: THAT IS,
ALL ESTATE CLAIMS AND INDIVIDUAL CLAIMS MADE BY GARY JOYNER</u>**

A.   <u>Claims at Issue</u>

As noted above, two types of claims were originally brought in

---

[4]   Plaintiff Hogsett voluntarily dismissed any estate claims
after defendants moved to dismiss those claims for failure to meet
Georgia's medical malpractice affidavit requirement.  (*See* Defs.'
Mot. to Dismiss [2] and Pls.' Notice of Voluntary Dismissal [5].)

[5]   Defendant Covenant Dove Holding Company also filed a motion
to dismiss for lack of personal jurisdiction [3].  Plaintiffs filed
two separate consent motions for an extension to respond [9, 13],
which were granted by the Court.  The last requested extension
expired on September 4, 2012 and plaintiffs still have not responded.
Accordingly, the Court **GRANTS** Covenant Dove Holding Company's motion
[3] as unopposed.  *See* LR 7.1B, NDGa (failure to file a response
shall indicate that there is no opposition to the motion).

6

this case: claims brought on behalf of the estate by its representative Shervon Hogsett and claims brought by the individual plaintiffs, Shervon Hogsett and Gary Joyner. The parties do not address how these claims differ, but as defendants arguably have a stronger ground for compelling arbitration on Shervon Hogsett's individual claims, it is important to have some idea what the differences might be. The Court assumes that estate claims would be those claims that would have been available to Ms. Joyner had she not died, such as any pain and suffering she endured and medical expenses she incurred as a result of the defendants' alleged negligence, as well as any funeral expenses, given that she did, in fact, die. The individual claims would be those claims available to daughter Hogsett and son Gary Joyner based on the death of their mother.

As noted, plaintiff Hogsett, as the representative of the estate, has dismissed all estate claims, apparently because she did not file a medical affidavit as required by Georgia law for medical malpractice claims. *See* O.C.G.A. § 9-11-9.1. Defendants suggest in their briefing[6] that the only remaining claims are the wrongful death

---

[6]    *See generally* Defs.' Reply Br. in Supp. of Their Mot. to Dismiss or Stay Proceedings and Compel Arbitration ("Defs.' Reply Br.") [12] and Mot. to Dismiss [2] at 2 ("The 'Estate claims' include all claims brought on behalf of the Estate of Patricia Joyner by her personal representative or administrator (in other words, all claims in this case other than the wrongful death claims).")(emphasis added).)

claims[7] of the two individual plaintiffs:  Shervon Hogsett and Gary
Joyner.  The Court will assume this to be so.

Yet, while it is true that the estate claims are now gone, it is
still important to analyze the effect of the arbitration agreement on
any such estate claims.  This is so because if the decedent Joyner
agreed to arbitrate any claims against defendants, then presumably
her survivors on a wrongful death claim would be bound by that
agreement as a wrongful death claim would be derivative of the
medical malpractice claim that the decedent could have made.
Conversely, if the arbitration agreement is deemed to be invalid and
not binding on decedent Joyner or her estate, then it presumably
would not be binding on her survivors' individual wrongful death
claim.

B.    <u>Did Hogsett Have the Power to Bind Her Mother to an
      Arbitration Agreement</u>?

1.    **Parties' Contentions**

Defendants  correctly  note  that  federal  law  favors  the
enforceability of arbitration agreements, even if there is arguably
inconsistent state law disfavoring arbitration.  *See generally Marmet
Health Care Ctr., Inc. v. Clayton Brown*, 565 U.S. ___, 132 S. Ct.

---

[7]  Implicit in defendants' argument is an assumption that a
medical affidavit does not have to be filed in a wrongful death
claim, even when the latter claim is based on an act of medical
malpractice.

8

1201 (2012)(per curiam)(Federal Arbitration Act permits enforcement of arbitration agreement entered into between residents and nursing homes, despite potentially contrary state law)(citing U.S. CONST., art. VI, cl. 2).   So while Georgia may have a strong interest in protecting its nursing home residents, this policy does not, as plaintiffs suggest, preclude care facilities and their residents from contracting to resolve potential disputes through arbitration.[8]

That said, an arbitration agreement is still a contract and, as such, it requires consent by the parties to the agreement.   Consent to a contract is a matter of state law.   Federal Arbitration Act, 9 U.S.C. § 2 (permitting revocation of arbitration agreement "upon such grounds as exist at law or in equity for the revocation of any contract"); *Ashburn Health Care Ctr., Inc. v. Poole*, 286 Ga. App. 24, 25 (2007)("[a]s the party seeking arbitration, [the defendant] bears the burden of proving the existence of a valid and enforceable agreement to arbitrate. . .[s]uch [an] agreement is, at base, a contract, and the [FAA] does not require parties to arbitrate when they have not agreed to.")(internal cite & quotation omitted).   Thus, before the scope or applicability of the arbitration agreement can be

---

[8]  Plaintiffs argued that even if Hogsett had authority to sign for Joyner, the arbitration agreement is void because its enforcement would hinder the efficacy of O.C.G.A. § 31-8-100 *et seq*, Georgia's "Bill of Rights for Residents of Long Term Care Facilities." (Pls.' Resp. [8] at 15-16.)  The *Marmet* decision defeats that argument.  At any rate, the argument is moot given the Court's ruling *infra*.

9

addressed, the party seeking to compel arbitration must first establish that there is an agreement. *TranSouth Fin. Corp. v. Rooks*, 269 Ga. App. 321, 324 (2004)(party seeking arbitration "bear[s] the burden of proof as to all the essential elements of the contract, including the assent to the contractual terms.")

The parties agree that Hogsett signed the arbitration agreement upon her mother's admittance to Parkwood. They disagree, however, about whether that signature gave rise to a valid agreement between decedent Joyner and the defendants.

Plaintiffs argue that Hogsett did not have authority to bind her mother to an agreement to arbitrate potential claims against the defendants. In support of this argument, plaintiffs note that Hogsett did not have a power of attorney agreement for, or guardianship over, her mother. Further, Hogsett stated in her declaration that Joyner had not given her permission to sign the admission documents on her behalf. (Hogsett Decl. [81] at ¶ 11.) Additionally, defendants offer neither an assertion nor any evidence that decedent Joyner had told the Parkwood Center staff that Hogsett could act on her behalf. Finally, defendants have not suggested that Joyner was incapable of making decisions for herself at the time of her admittance, as she was only 63 years old and her particular malady did not implicate any mental functioning on her part.

Defendants counter that even if Hogsett did not have express

10

Case 1:12-cv-01399-JEC   Document 24   Filed 02/18/14   Page 11 of 24

authority to act as an agent for Joyner, she had implied/apparent authority, and so Hogsett's signature should be construed as binding her mother.  Further, defendants note that while Joyner may not have been present when her daughter signed the admission forms, she never protested either Hogsett's signature on her behalf or her admittance to Parkwood.  (Defs.' Reply Br. [12] at 3-4.)  Thus, according to defendants, Joyner's consent to arbitration is implied from the circumstances.  (*Id.*)

        2.  **Standard for Determining Whether Authority Existed**

As the decedent Joyner never signed the arbitration agreement, her daughter Hogsett's signature on that agreement can bind Joyner and her estate only if Hogsett is deemed to have been an agent of her mother for this purpose.  Under Georgia law, "[t]he relation[ship] of principal and agent arises wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf."  O.C.G.A. § 10-6-1. Here, there is no indication that Joyner expressly authorized her daughter to agree to arbitrate away any claims that may have arisen during Joyner's stay.  To the contrary, Hogsett has filed a declaration indicating that she did not discuss her signature on the paperwork with her mother and, therefore, express consent by the latter was necessarily lacking.

Defendants do not disagree, but they contend that Hogsett acted

11

Case 1:12-cv-01399-JEC   Document 24   Filed 02/18/14   Page 12 of 24

with implied authority,[9] meaning that Hogsett would still have authority to enter contracts on Joyner's behalf. "[S]uch authority must be based on 'statements or conduct of the *alleged principal* [that] reasonably cause [a] third person to believe that the principal consents to have the act done on [her] behalf by the purported agent.'" *Ashburn*, 286 Ga. App. at 25-26 (quoting *Hinely v. Barrow*, 169 Ga. App. 529, 530 (1984)). Therefore, for implied authority to have arisen, the decedent Joyner must have given some indication that she agreed to be represented by her daughter Hogsett. *See Barrs v. Acree*, 302 Ga. App. 521, 525 (2010)(implied agency not found where a party "merely assumed" that an agent was acting for another) and *Hinely,* 169 Ga. App. at 530 ("[W]here the only evidence that a person is an agent of another party is the mere assumption that such agency existed, or an inference drawn from the actions of that person that he was an agent of another party, such evidence has no probative value and is insufficient to authorize a finding that

---

[9]    The Court is aware that, from a purist's point of view, "implied authority" and "apparent authority" are two distinct concepts, with implied authority being a form of actual authority and apparent authority constituting a different kind of authority. *See* generally Restatement (Third) of Agency §§ 2.01-2.03 (2006) (discussing the difference between implied authority and apparent authority). The Georgia caselaw and the Georgia statute cited above collapse the two terms and, whatever distinctions may have originally existed between the two principles, they don't affect the outcome here.    Accordingly, the Court likewise uses the term "implied authority" to reference both implied and apparent authority.

12

such an agency exists.")

### 3. Whether Hogsett Had Authority to Bind Her Mother to An Arbitration Agreement, Under the Facts of this Case

In the present case, the decedent Joyner never made any statements that would suggest to defendants that her daughter had the authority to bind her to an arbitration agreement. The Court further concludes that, under the circumstances here, defendants could not have inferred an agency relationship for purposes of assuming an agreement to arbitrate.

As to whether Joyner had "by implication" authorized her daughter to sign an arbitration agreement on her behalf, the facts do not support such an inference. As noted, Joyner's daughter signed the document outside the presence of her mother during her admission to the Parkwood facility. (Hogsett Decl. [8] at ¶¶ 5, 13.) Hogsett testified that no one on defendants' staff inquired whether she had authority to sign an arbitration agreement for her mother. (*Id.* at 5.) Defendants have offered no affidavits to the contrary on that point or to establish that staff had asked Joyner whether she consented to having her daughter sign an arbitration agreement.

Even assuming that Joyner must have deduced that her daughter had signed whatever documents Parkwood required for her admission, as Joyner would have known that she had signed nothing, one cannot assume that Joyner would have had the sophistication to understand

13

that, included among the standard medical forms, would be a separate agreement to give up her right to a jury trial should the rehabilitation center be guilty of negligence. Indeed, as defendant has conceded, Joyner's consent to the arbitration agreement was not a prerequisite to her admission, and she would have been admitted to the facility even had she known about the arbitration agreement and had refused to sign it. (*See* Defs.' Mot. to Dismiss [4] and Reply Br. [12].)

Moreover, even as to the admission document, defendants could not have inferred authority under a necessity-type of principle, which arguably might arise--at least as to the signing of the standard admission forms, if not an arbitration agreement--had Joyner been too ill to sign any forms at the time of her admission. Joyner was only 63 years old and, while she had previously had part of her leg amputated, there is no evidence to suggest that the Parkwood staff perceived her to be mentally or physically incompetent to sign such a document.

Certainly, it would be an unwise policy to require a nursing home or rehab center to turn away a patient in need of treatment who is physically or mentally unable to sign an admission form. Medical crises can arise suddenly and not all persons have prepared for such occasions by previously executing health care powers of attorney. Aware of the difficulties that such situations present, the Georgia

14

legislature has enacted a statute that seeks to address this potential problem. O.C.G.A. §§ 31-9-2(a)(1) and (1.1) provides that consent for medical treatment can be given by an adult person for himself or by any person having a durable power of attorney for health care. The statutes goes on to provide that, where there is no power of attorney, a spouse may give consent for treatment, as may the parent of a minor child or a person temporarily acting in loco parentis, even without formal credentials. O.C.G.A. §§ 31-9-2(a)(2)-(4). Finally, where the patient is unable to consent for himself and where there is no other individual who fits within the categories identified above, an adult child, among others, may consent for treatment for her parent. O.C.G.A. § 31-9-2(a)(6)(A).

It is uncertain that Hogsett's signature would have satisfied O.C.G.A. § 31-9-2's requirements for consent to medical treatment, as there has been no effort by the defendants to argue or show that Joyner was unable to consent for herself. Even had Hogsett's consent been valid under this statute, however, the statute addresses consent to medical treatment, not consent to submitting to arbitration any claims of negligence against the rehab center.[10]

_____

[10] The Georgia Senate recently considered legislation that would permit a wide-ranging group of people other than the resident to consent to arbitration of claims against nursing-home or rehab center types of facilities. *See* S.B. No. 202, GA 152d GEN. ASSEMB. - 2013-2014, REG. SESS. (Feb. 22, 2013), Proposed § 31-8-128(f)(6). Had this proposed statute been in effect when Joyner was admitted, then her

Finally, to the extent that defendants recognized an "implied" authority for Joyner's daughter to sign the arbitration agreement, inasmuch as she had signed the admission paperwork, they did so in contravention of their own contractual representation that such a status could not be imputed without compliance with the requisite legal requirements. Specifically, the admission agreement drafted by Parkwood and executed by Hogsett indicates that, when pertinent, a resident's "incapacity or delegation of decision-making authority must be documented in the living center's records in compliance with applicable Georgia statutes." (Defs.' Mot. to Dismiss [4] at Ex. A (emphasis added).) There is no such documentation of Joyner's incapacity nor any assertion by defendants that she was, in fact, incompetent to sign the arbitration agreement.

### 4.    Analogous Georgia Caselaw is Consistent With this Interpretation

This Court's decision is in accord with Georgia caselaw that has considered the issue of implied authority as it pertains to family members signing arbitration agreements for relatives who are admitted to nursing homes. In *Life Care Ctrs. of Am. v. Smith*, 298 Ga. App. 739 (2009), the defendant nursing facility sought to enforce an arbitration agreement signed by the resident's daughter. At the time

---

daughter's consent to arbitration would be valid. However, the statute was not then in effect, and in fact was not enacted.

16

the daughter signed the arbitration agreement, she had no general power of attorney, but only a durable power of attorney for health care decisions.    The court of appeals found the agreement unenforceable in the later tort action against the nursing home because the daughter did not have the general power of attorney necessary to agree to submit the mother to arbitration.    The court distinguished between the authority to seek medical care for another versus the authority to bind that other person to arbitration.

Similarly, in *Ashburn Health Care Ctr., Inc. v. Poole*, 286 Ga. App. 24 (2007), a husband signed an arbitration agreement upon his wife's admission to a nursing home.    Although the husband did not hold power of attorney for his wife, he nevertheless signed the agreement above a line listing him as an "authorized representative" of the wife.    *Id.* at 26.    The court of appeals held that the husband did not have actual or apparent authority to sign the arbitration agreement on behalf of his wife, and that the agreement was therefore unenforceable.[11]

---

[11]    Cases from other states that are in accord with *Ashburn* and *Smith* include:    *Giordano ex rel. Estate of Brennan v. Atria Assisted Living, Virginia Beach, L.L.C.*, 429 F. Supp. 2d 732, 738 (E.D. Va. 2006)(no mutual assent to arbitration where "[mother] did not sign the Residency Agreement; she did not give consent to [her daughter] to sign the Residency Agreement; [mother] did not discuss with [her daughter] whether the agreement would be beneficial to her; and, there is no proof that [the mother] was, in fact, aware that the Residency Agreement existed."); *McNally v. Beverly Enters., Inc.*, 191 P.3d 363 (Kan. Ct. App. 2008)(wife signed arbitration agreement on

AO 72A
(Rev.8/82)

Defendants do not address *Smith* or *Ashburn* in their Reply brief, suggesting a tacit recognition that controlling Georgia authority disfavors their arguments concerning implied authority. Moreover, as there is no binding arbitration agreement between the defendants and Joyner's estate, there would appear to be no theory under which the

---

behalf of husband but only had durable power of attorney to make medical decisions, and so no actual or implied authority existed); *Barbee v. Kindred Healthcare Operating, Inc.*, No. W2007-00517-COA-R3-CV, 2008 WL 4615858, at *6-9 (Tenn. Ct. App. Oct. 20, 2008) (decedent's son who signed arbitration agreement upon parent's admission but did not have power of attorney lacked actual or implied authority to act as agent); *Trinity Mission of Clinton, LLC v. Barber*, 988 So.2d 910, 916 (Miss. Ct. App. 2007) (invalidating arbitration agreement and noting that the principal must hold the agent out as having authority); *Sikes v. Heritage Oaks W. Ret. Vill.*, 238 S.W.3d 807 (Tx. Ct. App. 2007) (finding arbitration agreement unenforceable where wife of resident signed admissions documents, purporting to have power of attorney which she did not possess).

Some courts have concluded that a family member *can* enter into an arbitration agreement on behalf of a relative without having explicit power of attorney or guardianship, but generally only where there is some evidence that the admitted individual gave permission to the signee to enter into agreements on his behalf. *See Carraway v. Beverly Enters. Ala., Inc.*, 978 So.2d 27, 30-31 (2007) (brother who subsequently attained power of attorney could enter into arbitration agreement on behalf of sister where "[t]he arbitration agreement did not call for the signature of a legal representative; instead, it provided that 'a person duly authorized by the Resident' could sign the agreement on the resident's behalf"); *Ruesga v. Kindred Nursing Ctrs., L.L.C.*, 215 Ariz. 589, 595-597 (Ariz. Ct. App. 2007) (husband empowered his wife to enter arbitration agreement on his behalf, but only after defendant nursing home presented extensive evidence that the husband authorized wife in the past to make medical decisions on his behalf); *Necessary v. Life Care Ctrs. of Am., Inc.*, No. E2006-00453-COA-R3-CV, 2007 WL 3446636, at *5 (Tenn. Ct. App. Nov. 16, 2007) (arbitration agreement entered into on behalf of husband upheld where husband had expressly authorized his wife to enter into other agreements on his behalf).

18

individual wrongful death act claim of Joyner's surviving son Gary would be subject to a now-invalidated arbitration agreement. Certainly, defendants advance no arguments. The Court thus concludes that the individual claims of surviving son Gary Joyner are not subject to the arbitration agreement signed by Hogsett. Further, had the estate claims originally made in the complaint not been dismissed by plaintiffs, they would also not be subject to the arbitration agreement.

## II.   ENFORCEABILITY OF ARBITRATION AGREEMENT AS TO CLAIMS MADE BY PLAINTIFF SHERVON HOGSETT IN HER INDIVIDUAL CAPACITY

As noted, plaintiff Shervon Hogsett, the daughter of the deceased Patricia Joyner, has brought claims on her own behalf as a result of her mother's death. These claims appear to be wrongful death claims. Defendants argue that even if Patricia Joyner did not agree to arbitration, Hogsett unquestionably signed the arbitration agreement, so at least her own claims should be subject to arbitration. (Defs.' Reply Br. [12] at 10-11.) Although there is no authority directly on point, defendants' argument conflicts with several general principles of Georgia contract and wrongful death law.

As an initial matter, it is clear that had the arbitration agreement been deemed to be enforceable as to the decedent Joyner and her estate, then it also would have been enforceable as to any

19

individual wrongful death claims brought by her survivors, regardless of whether any of those survivors had signed the agreement. *Cf. Turner v. Walker Cnty.,* 200 Ga. App. 565, 566 (1991)(although the cause of action created by the wrongful death statute is a different action than the one the decedent would have possessed against a tortfeasor, any defense which would have been good against the decedent also applies to any persons bringing a wrongful death action); *accord Mowell v. Marks,* 269 Ga. App. 147, 151 (2004).

In short, as a wrongful death claim is a derivative claim that takes on all defenses available against the decedent, if the decedent was unable to prevail in a tort claim based on the conduct that led to her death, then her survivors would likewise be estopped. Here, the question is the converse of the above. Specifically, if a defendant's defense[12] would <u>fail</u> against a decedent, would that same defense also fail as to a survivor asserting a wrongful death claim based on the same conduct? More specifically, if a decedent could defeat a tort defendant's argument that she had agreed to arbitrate the claim, would the survivor of the decedent likewise succeed on an argument that the **arbitration agreement** in question was not binding on that survivor? The parties cite no case authority on this precise

---

[12]   The word "defense" here meaning that the defendant could insist on arbitration of the claim, instead of a trial, as sought by the plaintiff.

point, but it seems reasonable to assume that a survivor's claim would not be subject to an arbitration agreement entered into on behalf of the decedent, if the decedent, herself, would not have been so bound.

Indeed, there is no contractual basis for inferring an intent on the part of Ms. Hogsett, the daughter of the deceased, to arbitrate her wrongful death claim. As discussed above, consent to arbitrate is an essential component of an enforceable arbitration agreement. *Ashburn,* 286 Ga. App. at 25. It is apparent from the language of the arbitration agreement that Hogsett did not sign the agreement in her individual capacity. (Defs.' Mot. to Dismiss [4] at Ex. B.) Rather, the agreement expressly purports to govern the relationship between the "Resident" (Joyner) and the "Living Center" (Parkwood). (*Id.*) Hogsett did not, by signing the agreement in her representative capacity on behalf of her mother, express an intent to surrender any rights she might possess in her individual capacity. In the absence of Hogsett's consent to arbitrate, the Court cannot enforce the agreement against her. *See Sikes*, 238 S.W.3d at 810 ("[T]he arbitration agreement is unenforceable against [the daughter] in her individual capacity because there is no evidence that she signed in that capacity.").

This result is in accord with the Georgia wrongful death

21

statute, O.C.G.A. § 51-4-2.[13]   That statute permits the surviving child or children of a decedent to bring a wrongful death action in the event that there is no surviving spouse.[14]  O.C.G.A. § 51-4-2(a). Any amount recovered in such an action must be "equally divided" between the children "per capita."   O.C.G.A. § 51-4-2(d).   The statute thus contemplates one indivisible claim, the proceeds of which are to be divided between all surviving children. Requiring Hogsett, the daughter of the decedent, to arbitrate her claim against defendants, when her brother, the son of the decedent, would be simultaneously proceeding by trial, would not be workable and would arguably subvert the intent of the statute.

Finally, the Court rejects defendants' estoppel and ratification arguments.   Plaintiff's signature of the arbitration agreement, ostensibly in her representative capacity, does not "as a matter of equity and good conscience" preclude plaintiff from pursing a wrongful death claim in her individual capacity. *Hollifield v. Monte Vista Biblical Gardens, Inc.*, 251 Ga. App. 124, 126 (2001).  This is particularly so where defendants did not comply with their own

---

[13]   The statute actually speaks of "homicide" rather than "wrongful death."   "Homicide" in this context includes death from "(1) a crime, (2) criminal negligence or (3) other negligence." *Stiltjes v. Ridco Exterminating Co. Inc.*, 256 Ga. 255, 257 (1986).

[14]   The decedent did not have a surviving spouse. (Pls.' Mot. to Amend [16] at 2.)

22

procedures for documenting plaintiff's authority to act on Ms. Joyner's behalf. (Defs.' Mot. to Dismiss [4] at Ex. A, 2.) *Id.* ("The party asserting the benefit of estoppel must have acted in good faith and in the exercise of reasonable diligence.").

Ratification is similarly inapplicable. Defendants contend that Hogsett ratified the arbitration agreement by asserting breach of contract claims on behalf of Joyner's estate. As discussed, Hogsett has voluntarily dismissed the estate's breach of contract claims and is now pursuing a non-contractual wrongful death claim. Hogsett's tort claim does not depend on enforcement of the contract. *See Sikes,* 238 S.W.3d at 810 ("nonparties generally must arbitrate claims if liability arises from a contract with an arbitration clause, but not if liability arises from general obligations imposed by law").

As to the request for discovery on the authority issue, defendants do not adequately explain what they hope to discover. Defendants do not allege that Hogsett had a guardianship or power of attorney that would have sufficed to provide express authority for her to act as Joyner's agent. As to implied authority, defendants' own staff would presumably have the best knowledge of any supporting facts because that type of authority would be established by Joyner's statements or conduct that led the Parkwood staff to believe that she consented to the agency relationship. Defendants have not produced any staff testimony to suggest that there was implied authority. In

23

addition, it is undisputed that defendants did not follow their own procedures for documenting Hogsett's authority to act on behalf of Joyner at the time of her admission into Parkwood.  Under the circumstances, the Court does not believe that discovery is warranted.

<u>CONCLUSION</u>

For the reasons stated above, the Court **DENIES** defendants' Motion to Dismiss and Compel Arbitration [4] and **GRANTS as unopposed** defendant Covenant Dove Holding Company, LLC's Motion to Dismiss for Lack of Personal Jurisdiction [3].  The Court **DIRECTS** the parties to submit a joint preliminary report and discovery plan by **Monday, March 17, 2014**.  The Court further instructs the parties and the Clerk that this Amended Order should supplant the Court's previous Order [15] addressing the Motions to Dismiss [3] and [4].


SO ORDERED, this 14th day of February, 2014.


/s/ Julie E. Carnes
JULIE E. CARNES
CHIEF UNITED STATES DISTRICT JUDGE

24

## CERTIFICATE OF SERVICE

I hereby certify that I have caused a copy of the foregoing brief to be served

upon opposing counsel in this matter via U.S. Mail, properly addressed as follows:

Wayne D. Toth, Esq.
The Toth Law Firm, LLC
2890 Piedmont Road
Atlanta, GA 30305-2779

Steven Salcedo, Esq.
Law Offices of Steven Salcedo, LLC
One Decatur Town Center
150 E. Ponce de Leon Ave., Suite 225
Decatur, Georgia 30030-2543

This 14th day of April, 2014.

W. Jerad Rissler, Esq.